Slip Op. 12-95

UNITED STATES COURT OF INTERNATIONAL TRADE

_____        :
                                               :
YANTAI XINKE STEEL STRUCTURE                   :
CO. LTD.,                                       :
                                               :
                              Plaintiff,        :
               and                              :
                                               :
NINGBO JIULONG MACINERY CO.,                    :
LTD. and NINGBO HAITIAN                          :
INTERNATIONAL CO. LTD.,                          :
                                               :
                  Plaintiff-Intervenors,        :
                                               :
          v.                                    :       Court No. 10-00240
                                               :       Before:  Richard K. Eaton, Judge
                                               :
UNITED STATES                                   :
                                               :
                              Defendant,        :
                                               :
               and                              :
                                               :
ALABAMA METAL INDUSTRIES                        :
CORP. and FISHER AND LUDLOW,                    :
                                               :
                  Defendant-Intervenor          :
_____        :

OPINION AND ORDER

[Plaintiff's motion for judgment on the agency record granted, in part, and remanded.]

Dated: July 18, 2012

*David J. Craven*, Riggle & Craven, for plaintiff.

*Gregory S. Menegaz*, Dekieffer & Horgan, for plaintiff-intervenors.

*Tony West*, Assistant Attorney General; *Jeanne E. Davidson*, Director, *Claudia Burke, Jr.*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department

of Justice (*Michael Snyder*)*;* International Office of Chief Counsel for Import Administration, United States Department of Commerce (*Brian Soiset*), for defendant.

*Timothy C. Brightbill, Christopher B. Weld, and Tessa V. Capeloto*, Wiley Rein LLP, for defendant-intervenors.

Eaton, Judge:  This case is before the court on the motion of plaintiff Yantai Xinke Steel Structure Co., Ltd. ("Xinke") for judgment on the agency record, pursuant to USCIT R. 56.2, challenging the Department of Commerce's ("Commerce" or the "Department") final results in Certain Steel Grating from the People's Republic of China, 75 Fed. Reg. 32,366 (Dep't of Commerce June 8, 2010) (final determination of sales at less than fair value) ("Final Determination") and the accompanying Issues and Decision Memorandum ("Issues & Dec. Mem.") (collectively, the "Final Results").

BACKGROUND

On June 25, 2009, Commerce initiated an investigation to determine whether steel grating exported from the People's Republic of China ("PRC") was being sold in the United States at less than fair value.  Certain Steel Grating from the PRC, 74 Fed. Reg. 30,273 (Dep't of Commerce June 25, 2009) (initiation of antidumping investigation).  The period of investigation was October 1, 2008 through March 31, 2009 (the "POI").  Because Commerce determined that it was impractical to individually review all respondents exporting steel grating from the PRC during the POI, it chose Shanghai DAHE Grating Co., Ltd. ("Shanghai DAHE") and plaintiff-intervenor Ningbo Jiulong Machinery Co., Ltd. ("Jiulong") as mandatory respondents.  *See* 19 U.S.C. § 1677f-1(c)(2) (2006).  These two companies had the highest volume of exports to the United States during the POI.   Shanghai DAHE did not respond to the Department's

questionnaires nor did it otherwise participate in the investigation.   As a result, Commerce treated Jiulong as the sole mandatory respondent.[3]

When the Department limits the number of mandatory respondents that will be individually reviewed in an investigation of exports from a non-market economy country ("NME"), such as the PRC, it provides an opportunity for non-mandatory respondents to demonstrate that they operate independently from the government and, thus, qualify for a separate rate.   In this case, Commerce found that plaintiff Xinke and plaintiff-intervenor Ningbo Haitian International Co., Ltd. ("Haitian") (collectively, the "Separate Rate Respondents") demonstrated their independence from the PRC Government.[4]

Commerce generally calculates the antidumping rate for a non-mandatory respondent that qualifies for a separate rate by taking the weighted-average of all mandatory respondents' rates. *See* 19 U.S.C. § 1673d(c)(5)(A); *Bristol Metals LP v. United States*, 34 CIT __, 703 F. Supp. 2d 1370 (2010).   In the Preliminary Results, Commerce determined that Jiulong, the sole mandatory respondent, was independent from the PRC government and, thus, entitled to a separate rate, which it calculated at 14.36%.[5]   Certain Steel Grating from the PRC, 75 Fed. Reg. 847, 855 (Dep't of Commerce Jan. 6, 2010) (preliminary determination of sales at less than fair value)

---

[3] It is unclear why Commerce did not select a mandatory respondent to replace Shanghai DAHE, but neither plaintiff nor plaintiff-intervenors challenge this decision.

[4] Because the PRC is considered a non-market economy, all producers operating there are presumed to be part of one country-wide entity under the direction of the PRC government.   This presumption is rebuttable, however, upon a showing that an individual producer is independent from the PRC government.

[5] This rate was calculated using surrogate prices from India to value Jiulong's factors of production, other expenses, and profits, in accordance with the statutory methodology for calculating the normal value of products from non-market economy countries.   *See* 19 U.S.C. § 1677b(c).

("Preliminary Results").  Because Jiulong was the only cooperating mandatory respondent, this was also the rate preliminarily assigned to the Separate Rate Respondents.

Pursuant to 19 U.S.C. § 1677e(a), when information is missing from the record the Department may use facts otherwise available to fill the gap.  Moreover, if Commerce finds that a respondent has failed to cooperate to the best of its ability, it may use an adverse inference in choosing from among the facts otherwise available.  19 U.S.C. § 1677e(a)-(b).  Following the Preliminary Results, the Department determined that Jiulong had failed to cooperate to the best of its ability because it did not timely and fully disclose certain information identifying the hot-rolled steel inputs used in manufacturing its grated steel exports, and that the documents that were produced to identify the company's steel inputs contained false and inaccurate information.  On this basis, the Department assigned Jiulong a rate based on "total"[6] adverse facts available ("AFA") pursuant to 19 U.S.C. § 1677e(b).  Having made these findings, the Department determined that it could not rely on any information provided by Jiulong, including the company's separate-rate questionnaire responses.  Thus, Commerce determined that Jiulong had failed to establish its independence from the PRC-wide entity, and the company was assigned the PRC-wide rate of 145.18% as AFA.  The 145.18% rate was the highest rate alleged in defendant-intervenors' petition seeking the initiation of the investigation.

The Department further determined that it would be improper to assign a rate based entirely on AFA to the Separate Rate Respondents.  Consequently, the Department assigned the

---

[6] While the phrase "total AFA" is not referenced in either the statute or the agency's regulations, it can be understood, within the context of this case, as referring to Commerce's application of the "facts otherwise available" and "adverse inferences" provisions of 19 U.S.C. § 1677e to all determinations with respect to Jiulong after rejecting as untrustworthy all information submitted by the company in this investigation.

Separate Rate Respondents a margin of 136.76%, based on the simple average of dumping margins alleged in the petition.  Final Determination, 75 Fed. Reg. at 32,368.

By its motion, plaintiff, joined by plaintiff-intervenors, challenges the Department's decisions to (1) assign the Separate Rate Respondents a margin based on the simple average of the petition rates; and (2) apply AFA to mandatory respondent Jiulong.  For the reasons stated below, the motion is granted in part, and this matter is remanded.

STANDARD OF REVIEW

The standard of review is set forth in 19 U.S.C. § 1516a(b)(1)(B)(i), which provides, in relevant part, that the court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  Accordingly, "Commerce's determinations of fact must be sustained unless unsupported by substantial evidence in the record and its legal conclusions must be sustained unless not in accordance with law."  *Norsk Hydro Canada, Inc. v. United States*, 472 F.3d 1347, 1357 (Fed. Cir. 2006).

DISCUSSION

I.  Commerce's Methodology of Averaging the Petition Rates When Assigning Separate Rate Respondents' Rates Was Unreasonable

A.  Legal Framework

An antidumping margin is calculated by finding the difference between the normal value and the U.S. export price for a particular good.  *See* 19 U.S.C. §§ 1673e(a)(1), 1677(35).  The normal value is either the price of the merchandise when sold for consumption in the exporting country or the price of the merchandise when sold for consumption in a similar country.  19

U.S.C. § 1677b(a)(1).  The export price is the price that the merchandise is sold for in the United States.  19 U.S.C. § 1677a(a)-(b).  When determining normal value for goods exported from countries deemed to be NMEs, the Department does not rely upon the actual sales prices in the exporting country because they are not determined by market forces.  Rather, under the statutory methodology for determining antidumping margins for imports from NME countries, Commerce constructs "the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise" plus "an amount for general expenses and profit plus the cost of containers, coverings, and other expenses."   19 U.S.C. § 1677b(c)(1). Surrogate values from market economy countries are used as a measure of the value of these items.  *See id.*; *GPX Int'l Tire Corp. v. United States*, 34 CIT __, __, 715 F. Supp. 2d 1337, 1347 (2010), *aff'd*, 666 F.3d 732 (Fed. Cir. 2011).  When using surrogate prices to value the factors of production, Commerce must use "the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority."  *See* 19 U.S.C. § 1677b(c)(1).  In addition, the Department is charged to "determine margins 'as accurately as possible."  *See Lasko Metal Prods. v. United States*, 43 F.3d 1442, 1446 (Fed. Cir. 1994) (citations omitted).

When setting the rate for non-mandatory respondents qualifying for a separate rate, such as the Separate Rate Respondents, the Department generally follows the statutory method for determining the all-others rate in non-NME investigations.  *See Amanda Foods (Vietnam) Ltd. v. United States*, 33 CIT __, __, 647 F. Supp. 2d 1368, 1379 (2009) ("To determine the dumping margin for non-mandatory respondents in NME cases (that is, to determine the 'separate rates' margin), Commerce normally relies on the 'all others rate' provision of 19 U.S.C. § 1673d(c)(5).").  Under this method, Commerce would normally have assigned the Separate Rate

Respondents a margin equal to the average weighted margin for all mandatory respondents.  In this case, that would be the overall margin assigned to Jiulong, the lone mandatory respondent. If, however, "the estimated weighted average dumping margins established for all exporters and producers individually investigated are zero or de minimis margins, or are determined entirely under section  [19 U.S.C. § 1677e (use of facts available)], the [Department] may use any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated . . . ."  19 U.S.C. § 1673d(c)(5)(B); *see* Statement of Administrative Action, H.R. Rep. 103-316, reprinted in 103 U.S.C.C.A.N. 4126, 4201 ("Section 219(b) of the bill adds new section [19 U.S.C. § 1673d(c)(5)] which provides an exception to the general rule if the dumping margins for all of the exporters and producers that are individually investigated are determined entirely on the basis of the facts available or are zero or *de minimis*.  In such situations, Commerce may use any reasonable method to calculate the all others rate.").  Here, because Jiulong's rate was based entirely on facts available and AFA, the issue is whether the Department employed a "reasonable method" in assigning an antidumping rate to the Separate Rate Respondents.

   B. The Department's Failure to Consider Alternate Surrogate Value Information Was
      Unreasonable

      As noted, Jiulong, the only mandatory respondent in this case, was assigned an antidumping rate equal to the country-wide rate of 145.18% based entirely on facts otherwise available and AFA.  Therefore, pursuant to 19 U.S.C. § 1673d(c)(5)(B), the Department did not rely on Jiulong's dumping margin to determine the Separate Rate Respondents' margin, but rather, turned to what it insists was a "reasonable method" for assigning a rate to them.  *See* 19 U.S.C. § 1673d(c)(5).

Commerce's chosen method was to take a simple average of the rates set forth in the petition filed by defendant-intervenors, Alabama Metal Industries Corp. and Fisher and Ludlow ("Petitioners"), when seeking to initiate the investigation.   According to the Department, "[b]ecause the petition contained five [U.S.] price-to-[normal value] dumping margins, the Department has determined to create the rate of the separate rate respondents, including Xinke and Haitian, using the simple average of these rates, pursuant to its normal practice" for assigning rates to non-mandatory respondents when the mandatory respondents' rates cannot be used.   Issues & Dec. Mem. at 33.   Commerce, thus, calculated the Separate Rate Respondents' margin by taking the average of the difference between the U.S. prices and the corresponding normal values derived from the surrogate data provided in the petition.[7]

During the investigation, as they do now, Separate Rate Respondents argued that the normal value "should be recalculated using the [surrogate values] for financial ratios, material inputs, energy, and packing materials that have been submitted for the record in this case." Issues & Dec. Mem. at 32.   Thus, they maintain that data submitted by Xinke during the investigation, as part of the surrogate value process, was more reliable than the surrogate data used by Petitioners to calculate the petition rates.[8]   *See* Xinke Surrogate Value Submissions, A-

---

[7] To arrive at the normal value of PRC grated steel exports for inclusion in their petition, Petitioners gathered factors of production data from comparable U.S. steel producers regarding raw material quantities, labor consumption, and energy consumption.   Petitioners valued the raw materials using publicly available surrogate data from India, including information from the Global Trade Information Service's Global Trade Atlas database.   Labor costs were valued using the Department's "NME Wage Rates for the PRC."   Energy consumption was valued using the Indian electricity rate reported by the Central Electric Authority of the Government of India.   For the factory overhead, selling, general and administrative expenses, and profit components to normal value, Petitioners relied on the financial statements of the Indian company Mekins Agro Products Limited for the fiscal year April 2007 through March 2008.   *See* Certain Steel Grating from the PRC, 74 Fed. Reg. 30,273, 30,275-76 (Dep't of Commerce June 25, 2009).

[8] During the investigation, information was placed on the record calling into question whether it was appropriate for the Department to rely on Mekins Agro Products Limited's financial

570-947 (Mar. 1, 2010) (P.R. Doc. 167); Jiulong Surrogate Value Submissions, A-570-947 (Mar.

1, 2010) (P.R. Doc. 168); Petitioners' Surrogate Value Submissions, A-570-947 (Mar. 1, 2010)

(P.R. Doc. 169).

In the Final Results, Commerce declined to consider the Separate Rate Respondents'

surrogate value submissions stating that "[t]here is no need, in this case, to revise the initiation

margins, as suggested by Xinke and Haitian, because, as noted, the methodology used by the

Department is a reasonable method, as required by [19 U.S.C. § 1673d(c)(5)(B)]."  Issues &

Dec. Mem. at 33.  Thus, the Department provided no explanation as to why its method was

reasonable, or why its decision not to take into account the surrogate values supplied by Xinke

fulfilled its responsibility to determine margins "as accurately as possible."  *See Lasko*, 43 F.3d

at 1446; *Parkdale Int'l v. United States*, 475 F.3d 1375 (Fed. Cir. 2007); *Yantai Oriental Juice

Co. v. United States*, 27 CIT 477, 488 (2003) (not reported in Federal Supplement) (remanding

the case because "Commerce nowhere explains how its choice of methodology [under section

1673d(c)(5)(B)] established the Cooperative Respondents' antidumping duty margin 'as

accurately as possible'").  Rather, the Department simply declared its method to be reasonable.

The Department attempts to justify its approach by claiming that "[t]he application of this

methodology in NME investigations in which the individually investigated rates are based

entirely on AFA has been upheld by the CIT."  Issues & Dec. Mem. at 33.  In support of this

---

statements for the fiscal year April 2007 to March 2008.  According to Xinke, this is because
Mekins Agro Products Limited received subsidies and inaccurately reported depreciation, and
these statements are incomplete, do not specifically identify raw materials, and are outdated.  *See
QVD Foods Co. v. United States*, 34 CIT __, __, 721 F. Supp. 2d 1311, 1315 (2010) (discussing
the criteria used by Commerce in choosing the best available surrogate data).  Xinke contends
that it placed Mekins Agro Products Limited's financial statements for the POI on the record,
and if Mekins Agro Products Limited's financial statements are to be used at all, the Department
should use the contemporaneous statements.  According to Xinke, by using this information, the
Department would have arrived at a lower normal value and, thus, a lower dumping margin for
the Separate Rate Respondents.

contention, Commerce relies solely upon this Court's decision in *Bristol Metals LP v. United States* for the proposition that its method of determining non-mandatory respondents' rates based upon a simple average of the petition margins, in the absence of suitable rates from mandatory respondents, is per se reasonable.  34 CIT __, 703 F. Supp. 2d 1370 (2010).  *Bristol Metals*, however, does not support this conclusion.

In *Bristol Metals*, as here, the only mandatory respondent was assigned a rate based entirely on AFA, and Commerce determined the rate for non-mandatory separate rate respondents based on the simple average of the petition rates.  In *Bristol Metals*, however, the petitioners challenged this simple average methodology, which the Court upheld.  In that case, however, no party had placed any alternative surrogate value data on the record or challenged the petition rates as not being based on the best surrogate data available on the record.  Indeed, in challenging the rate, the petitioners in *Bristol Metals* argued that Commerce should have assigned a margin that factored in the AFA rate assigned to the only mandatory respondent, which would have increased the rate for non-mandatory separate rate respondents.  Thus, although *Bristol* held that an average of the petition rates may constitute a "reasonable method" for determining a separate rate for non-mandatory respondents, it does not stand for the proposition that this method will be reasonable in all cases.

In addition to arguing that its method was per se reasonable under *Bristol Metals*, defendant claims that Commerce was not required to reexamine the petition rates in light of other information placed on the record because the Department already determined that these rates were reliable enough to warrant the initiation of the investigation.  Defendant contends that "[b]y initiating the investigation, Commerce reached a determination as to the reliability of this information, and requiring Commerce to reopen this finding would undermine the finality of that

decision and allow parties to attack the adequacy of Commerce's initiation well after the fact." Def.'s Mem. Opp. to Mot. J. Agency R. 16 ("Def.'s Mem.").

The court finds defendant's justifications for disregarding surrogate data on the record unpersuasive.  First, Commerce's determination that the adjusted petition rates were sufficient to warrant initiation of an investigation is not the same as finding those rates reliable for determining a rate after the investigation has been concluded.  Prior to initiating an investigation, Commerce, by regulation, is required to determine whether the petition includes information "relevant to the calculation of normal value" for goods from a NME, in order to allow for an alleged dumping margin to be calculated.  19 C.F.R. § 351.202(b)(7)(C) (2011).  In evaluating the adequacy of that information, Commerce need only find that the petition is based upon factual information "reasonably available to [petitioners] at the time they file the petition." *Id.* § 351.202(b).  This determination is made in an ex parte proceeding, during which only the petitioners submit information to the Department.  As such, the petition constitutes nothing more than "an allegation of dumping, not a determination of dumping." *See  Zhejiang Native Produce & Animal By-Prod. Imp. & Exp. Corp. v. United States*, 35 CIT __, __, Slip. Op. 11-110, at 20 (2011) (citing MANUAL FOR THE PRACTICE OF U.S. INTERNATIONAL TRADE LAW 595 (William K. Ince & Leslie A. Glick, eds. 2001)).

Next, requiring the Department to examine record evidence in addition to that contained in the petition in no way disturbs the "finality" of its decision to initiate an investigation.  Put another way, "[p]rior to initiating an investigation, the Department makes no determination [that] unfair trade practices [have occurred].  Rather, it merely decides if the petitioners have provided a sufficient basis for initiating an investigation, *i.e.*, whether they allege the elements necessary for the imposition of an antidumping duty."  *Id.*  Accordingly, Commerce's preliminary

conclusion that the petition has sufficient "relevant" evidence to initiate an investigation does not mean that it can simply ignore additional evidence produced by respondents at the later, adversarial stages of the proceeding.

This conclusion is demonstrated by the manner in which an investigation is conducted. To determine a margin, Commerce does not merely use the surrogate values alleged in the petition, but seeks other values from the parties by means of questionnaires and the acceptance of submissions. Here, as a result of the investigation, Commerce, had record evidence before it that may well have assisted in determining an accurate rate for the Separate Rate Respondents. For instance, it appears that Commerce relied on petition rates that were calculated using financial ratios for the year prior to the POI, when financials for the POI were on the record. Considering the statutory scheme for determining dumping margins, Commerce's decision to ignore readily available and possibly more reliable surrogate value information when assigning an antidumping duty rate was not a reasonable one.

For these reasons, this matter must be remanded for the Department to consider the complete record in order to determine whether a more accurate antidumping margin could be assigned based on the surrogate data submitted during the investigation.


II.    Whether the Department Improperly Applied AFA to Mandatory Respondent Jiulong

     A.  Legal Framework for Applying AFA

As noted, the Department generally makes its antidumping determinations based on the information it solicits from interested parties concerning the normal value and export price of the subject merchandise. When "'Commerce has received less than the full and complete facts needed to make a determination'" from the respondents it may, however, rest its determinations on "facts otherwise available . . . 'to fill in the gaps.'" *Gerber Food (Yunnan) Co., Ltd. V.*

*United States*, 29 CIT 753, 767, 387 F. Supp. 2d 1270, 1283 (2005) (quoting *Nippon Steel Corp.*

*v. United States*, 337 F.3d 1373, 1381 (Fed. Cir. 2003)).  Therefore, if a respondent in a review

"withholds information that has been requested by the [Department]," "fails to provide

[requested] information by the deadlines for submission or in the form and manner requested,"

"significantly impedes a proceeding," or "provides such information but the information cannot

be verified," Commerce is permitted to use "facts otherwise available" to determine the rate.  19

U.S.C. § 1677e(a)(2).

      Once Commerce finds that the use of facts otherwise available is warranted, pursuant to

section 1677e(b), if the Department further "finds that an interested party has failed to cooperate

by not acting to the best of its ability to comply with a request for information," it "may use an

inference that is adverse to the interests of that party in selecting from among the facts otherwise

available."  As the Court of Appeals for the Federal Circuit has explained,

> subsection (b) [of § 1677e] permits Commerce to "use an inference that is adverse
> to the interest of [a respondent] in selecting from among the facts otherwise
> available," only if Commerce makes the separate determination that the
> respondent "has failed to cooperate by not acting to the best of its ability to
> comply."  The focus of subsection (b) *is respondent's failure to cooperate to the*
> *best of its ability*, not its failure to provide requested information.

*Nippon Steel*, 337 F.3d at 1381.  Accordingly, Commerce may apply AFA if it determines that

(1) the use of facts otherwise available is warranted under section 1677e(a), and (2) a respondent

has failed to cooperate to the best of its ability under section 1677e(b).  A respondent fails to act

to "the best of its ability" if it fails to "do the maximum it is able to do."  *Nippon Steel*, 337 F.3d

at 1382.  In selecting an AFA rate, the Department may rely on secondary information, including

"(1) the petition, (2) a final determination in the investigation under this subtitle, (3) any

previous review under [19 U.S.C. § 1675] or determination under [19 USCS § 1675b], or (4) any

other information placed on the record."  19 U.S.C. § 1677e(b).  "When the administering

authority or the Commission relies on secondary information rather than on information obtained in the course of an investigation or review, the administering authority or the Commission, as the case may be, shall, to the extent practicable, corroborate that information from independent sources that are reasonably at their disposal." 19 U.S.C. § 1677e(c).

B. The Department's Determination to Apply AFA to Jiulong was Supported by Substantial Evidence

Here, the Department determined to apply facts otherwise available, finding that "Jiulong withheld information that had been requested, significantly impeded this proceeding, and provided information that could not be verified." *See* Application of Total Adverse Facts Available to Ningbo Jiulong Memorandum, A-570-947, at 1 (Dep't of Commerce May 28, 2010) ("AFA Memo"). In addition, the Department determined that an adverse inference should be used in selecting among the facts otherwise available because "Jiulong failed to cooperate to the best of its ability" to comply with requests for information. AFA Memo at 1. These determinations were based on the Department's findings that information concerning Jiulong's steel inputs–a major factor of production in the manufacture of the subject merchandise–was either missing from the record or otherwise unreliable, and that Jiulong had not acted to the best of its ability to provide this information. Commerce further found that these deficiencies left the Department without adequate information to calculate a dumping margin for the company's merchandise. *See* Issues & Dec. Mem. at 11.[9]

---

[9] Defendant contends that "plaintiff-intervenor [sic] did not file their own summons and complaint to challenge Commerce's determination in order to pursue their own interests, but instead chose to intervene and support the interests of Xinke. As such, they are limited to the 'proceeding as it stands' and cannot 'enlarge those issues [under review] or compel an alteration of the nature of the proceeding.'" Def.'s Mem. 19. Defendant further contends that "to the extent that Count 3 of its complaint states that [] Jiulong should not have been given an adverse rate at all, Xinke has waived that claim because it failed to argue it in its opening brief." Def.'s

In order to place the Department's findings in context, it is important to understand the

order in which the facts developed.  Petitioners first questioned Jiulong's claimed steel inputs

prior to the issuance of the Preliminary Results.  In its questionnaire responses, Jiulong claimed

that it used "narrow coil"[10] steel strip to produce the subject merchandise.  *See* Jiulong's

Supplemental Questionnaire Response, A-570-947, at 3-4 (Oct. 16, 2009) (P.R. Doc. 99).

Petitioners challenged this claim, asserting that the Department should have used surrogate

values for "wide coil"[11] steel sheet, as these more likely reflected the actual inputs used by

Jiulong.  *See* Petitioner's Comments, A-570-947, at 6-9 (Nov. 9, 2009) (P.R. Doc. 120).

Surrogate data indicated that the price of the steel strip reported by Jiulong was lower than the

values for the steel sheet placed on the record by Petitioners.  To support its claim, on November

18, 2009, Jiulong submitted evidence, in the form of purchase orders and copies of sample

---

Mem. 17-18.  In other words, defendant contends that Jiulong cannot challenge the Department's
AFA determination because it did not file a separate pleading, and the plaintiff waived this issue.
The court finds defendant's contention to be without merit, as Xinke did challenge Commerce's
assignment of AFA to Jiulong in its opening brief.  Moreover, nothing in the USCIT Rules
would have prevented Jiulong, as a plaintiff-intervenor, from raising the issue if Xinke had not.
USCIT R. 24, which governs intervention, does not require intervenors in cases brought under 28
U.S.C. § 1581(c) (2006) to file separate pleadings, so long as the intervenor identifies the
administrative determination and issues it seeks to litigate in its motion to intervene.  Indeed,
Rule 24(c)(1) requires that a party seeking to intervene file a separate pleading "[e]xcept in an
action described in 28 U.S.C. § 1581(c)."  If the motion to intervene is filed within the time
limits for the intervenor to file its own separate action, the intervenor may interpose any claim
"within the scope of the original litigation." *Elkton Sparkler Co. v. United States,* 16 CIT 1048,
1049 (1992) (not reported in Federal Supplement).  In its complaint, plaintiff specifically
challenged the Department's determination to apply AFA to Jiulong.  Accordingly, Jiulong's
claims were clearly within the scope of the original action, and are thus properly asserted in this
action.

[10] Narrow coil is steel strip classifiable under the Harmonized Tariff Schedule ("HTS") heading
7211 as "Flat-rolled products of iron or non-alloy steel, of a width of less than 600 mm, not clad,
plated or coated."

[11] Wide Coil is steel sheet classifiable under HTS heading 7208 as "Flat-rolled products of iron
or non-alloy steel, of a width of 600 mm or more, hot-rolled, not clad, plated or coated."

"certificates of production," or mill test certificates from its steel suppliers, that it used steel strip in manufacturing the subject merchandise.

In the Preliminary Results, Commerce calculated Jiulong's margin using surrogate values for steel strip.  In doing so, however, the Department noted that "we have determined to use, for the preliminary determination, [] Jiulong's reported steel strip as its hot-rolled steel input surrogate value, because the Department has no contrary evidence that [] Jiulong used hot-rolled steel sheet or other hot-rolled steel as its hot-rolled steel input.  However, at verification, we will examine this surrogate value to further analyze [] Jiulong's hot-rolled steel input."  Preliminary Results, 75 Fed. Reg. at 855.

At verification, the Department requested further supporting documentation from Jiulong concerning its steel inputs.  Jiulong responded by providing purchase invoices, inventory slips, delivery notes, and additional supplier mill test certificates that it claimed covered all steel purchases made during the POI.  *See* Jiulong Second Supplemental Questionnaire Responses, A-570-947 (Nov. 18, 2009) (P.R. Doc. 123; C.R. Doc. 50);  AFA Memo at 3-4; Memorandum re Verification of the Sales and Factors Response of Ningbo Jiulong, A-570-947, at Exs. 19, 21 (Dep't of Commerce Feb. 23, 2010) (P.R. Doc. 164) ("Verification Report").  Commerce found that these submissions appeared to reflect that the steel purchased by Jiulong during the POI was, in fact, steel strip.  Verification Report at 17-18.  Petitioners, however, continued to question the accuracy and veracity of this documentation.

On March 8, 2010, Petitioners filed comments identifying various irregularities in the supplier mill test certificates Jiulong submitted, indicating that they were inaccurate and/or fraudulent.  This included an analysis showing certificates listing the same weight and characteristics for different products from different batches of steel, and certificates with

consecutive control numbers for orders submitted weeks apart. *See* AFA Memo at 4-5. Thus, Petitioners maintained that Jiulong's submissions could not be relied upon to demonstrate that it used the less expensive steel strip, rather than steel sheet, as its hot-rolled steel input.

In response to Petitioners' comments, the Department issued several supplemental questionnaires to Jiulong, which sought additional confirmation of the steel inputs. In addition, on March 9, 2010, the Department asked the United States Customs and Border Protection ("Customs") to produce any mill test certificates filed by Jiulong's importer of record during the POI. On March 10, 2009, Commerce asked that Jiulong produce mill test certificates it provided to its U.S. customers for selected sales, noting that purchase orders and other documentation indicated that Jiulong was obligated to provide such certificates in connection with these transactions. AFA Memo at 5-6.

The Department received twenty-seven mill test certificates from Customs on March 18, 2010. These certificates were created by Jiulong during the POI, and submitted to Customs by its importer of record. The next day, Jiulong responded to the Department's March 8, 2010 supplemental questionnaire by informing the Department that

> (1) [] Jiulong could not trace any of its suppliers' mill test certificates to specific purchases of steel coil or wire rod, because mill test certificates are production records that pertain to steel sold to multiple customers; (2) mill test certificates are not accounting records (e.g., invoices, inventory slips, delivery notes), and thus [] Jiulong does not keep mill test certificates in its records in the normal course of business; (3) [] Jiulong creates its own . . . mill test certificates for one customer that requests them [by approximating chemical properties using certain industry standards], and has no ability to determine with its own analysis the chemical properties of any steel [inputs] that it purchases; and (4) irregularities in the mill test certificates noted by Petitioners are due to the carelessness of [Jiulong's] suppliers and/or "estimations" made by its suppliers using the content of prior mill test certificates. [] Jiulong also submitted [additional] mill test certificates [it created] dated within the [POI], including the certificates that the Department had obtained from [Customs].

AFA Memo at 5-6 (citing Jiulong's Supplemental Questionnaire Responses, A-570-947, at 6-19,

Exs. 4, 7 (Mar. 19, 2010) (P.R. Doc. 195).

Thus, the facts pertinent to Commerce's determination to apply AFA to Jiulong are as

follows.  In order to value the important input of the hot-rolled steel used to make Jiulong's

gratings the Department issued questionnaires.  In response to these questionnaires, Jiulong

submitted documentation, including mill test certificates from its suppliers, tending to establish

that it used steel strip to manufacture the subject merchandise.  The company produced this

documentation, and only this documentation, even though it had prepared its own documentation

for its customers that conflicted with the supplier mill test certificates.  These customer mill test

certificates were submitted to Customs by Jiulong's importer of record.  Following questions

being raised by Petitioners, Commerce sought the documents submitted to Customs by Jiulong's

importer.  Only after learning that Commerce had requested these documents from Customs did

Jiulong produce them for the Department's examination.  Commerce then determined that

Jiulong's behavior warranted the use of facts available and AFA.  Although Jiulong makes

several arguments as to why the Department erred in doing so, the court is unconvinced.

In reaching its conclusions, Commerce found that accurate identification of Jiulong's

steel inputs was critical to determining the normal value of the subject merchandise because they

"represent the majority of the manufacturing cost of steel grating."  Issues & Dec. Mem. at 14.

Thus, the Department reasoned that it was important that it find whether steel strip or steel sheet

was used in the manufacture of Jiulong's products.

For the Department, one means of establishing whether steel strip or steel sheet was used

to make Jiulong's grates was to examine mill test certificates.  As noted, Jiulong provided some

of the mill test certificates prepared by its suppliers prior to verification, but did not produce

other documents the company gave its customers until verification.   Commerce found that "Jiulong withheld from the Department the mill test certificates provided to its customers with its sales of steel grating.   Moreover, these mill test certificates contain information materially different from the supplier mill test certificates [] Jiulong provided to the Department prior to, and at verification.   Thus, [] Jiulong was aware that its supplier mill test certificates were false documents."   AFA Memo at 11.   In reaching this conclusion, the Department found that, during the POI, Jiulong had prepared its own customer mill test certificates containing information different from the supplier mill test certificates, and Jiulong acknowledged that the suppliers' certificates were often inaccurate or false.   Commerce concluded that these facts indicated that, at the time it created its customer mill test certificates, the company knew that the supplier-provided certificates–that it submitted to Commerce–were inaccurate.   Finally, Jiulong did not provide Commerce with the mill test certificates it prepared for its customers until it learned that the Department was seeking them from Customs.   Therefore, because Jiulong's customer mill test certificates were created prior to Commerce's questionnaires being issued, the Department determined that Jiulong withheld this information in responding to the original and supplemental questionnaires during the investigation and at verification.

Jiulong challenges Commerce's conclusion that the customer mill test certificates were withheld, arguing that they were eventually produced for the record by Jiulong during verification.   Pl.-Intvs.' Mem. Supp. Mot. J. Agency R. 18 ("Pl.-Intvs.' Mem.").   The court, however, cannot credit this explanation.   The mere fact that Jiulong eventually provided Commerce with information that was responsive to earlier requests does not render Commerce's conclusion that this information was withheld unreasonable.   Indeed, the untimely provision of requested information is, itself, a basis for the application of facts available.   *See* 19 U.S.C. §

1677e(a)(2)(B); Issues & Dec. Mem. at 14 ("By discovering the existence of a second set of mill test certificates at this late stage of the proceeding, the Department is effectively deprived from any meaningful opportunity to examine, request additional information or verify any of the factual information [] Jiulong submitted in response to the Department's post-verification requests."). Thus, Commerce's determination that Jiulong withheld material information is supported by substantial evidence.

Next, Commerce found that Jiulong's knowing submission of false supplier mill test certificates, and its withholding of the customer mill test certificates, which were crucial to identifying the company's hot-rolled steel inputs, significantly impeded the investigation. According to the Department,

> Jiulong impeded this investigation because it failed to inform the Department throughout this proceeding that it maintained two sets of contradictory mill test certificates for steel coil, that the supplier mill test certificates it provided to the Department prior to, and at verification, did not correspond to mill test certificates [] Jiulong provided to its U.S. customers of steel grating, and that the supplier mill test certificates contained false information. [] Jiulong further impeded this proceeding by denying the existence of [] mill test certificates [the company prepared], only to produce them after the importer of record submitted them to [Customs]. . . . Jiulong chose to support the reported composition and specifications of its steel inputs using false documents and thereby impeded the investigation.

AFA Memo at 12.

According to Jiulong, there are two reasons why the record does not contain substantial evidence to support Commerce's conclusion that the company maintained two contradictory sets of mill test certificates. First, Jiulong claims that the certificates provided by Jiulong to its customers are "by no meaningful sense of the term 'Mill' certificates." Pl.-Intvs.' Mem. 18. In other words, Jiulong claims that "mill test certificates" is a term of art for documents prepared by steel mills to identify the properties of steel sold to manufacturers such as Jiulong. Thus,

according to Jiulong, the documents it prepared for its customers, although purporting to identify

the steel used in manufacturing the merchandise sold, were not "mill test certificates."

Even assuming that the Department may have mislabeled the certificates provided by

Jiulong to its customers, this fact does not undermine Commerce's finding that the company

impeded the investigation.  That is, there is simply no question that Jiulong prepared documents,

which it gave to its customers and which were submitted to Customs, purporting to state the

composition of its merchandise.  Further, there is no question that this documentation was at

odds with the mill test certificates it received from its suppliers.  These two sets of documents

called into question the accuracy of Jiulong's questionnaire responses concerning the type of hot-

rolled steel it used because both sets of documents seemingly identified Jiulong's steel inputs,

but were inconsistent.  Based on Jiulong's own submissions, the Department found that the

company prepared its own certificates for its customers because it knew that the certificates

prepared by its suppliers were inaccurate.  According to the Department, "[i]f [] Jiulong had

considered the supplier mill test certificates to be accurate, [] Jiulong would have relied on this

information" when providing certificates to its customers.  AFA Memo at 11.  It is clear that the

Department was reasonable in its determination that Jiulong impeded the investigation by

submitting questionnaire responses it knew to be inaccurate and by not providing all of the

documents in its possession.  The Department's reference to the customer certificates prepared

by Jiulong as "mill test certificates" is irrelevant to this conclusion.

Next, Jiulong claims that the two sets of certificates were not contradictory because "the

quality certificates were all consistent with all the actual 'mill' certificates . . . [because] they all

showed carbon content under .25% in conformity with the requirement for [published industry

standards].  The fact that one certificate was slightly higher or lower in carbon content simply

was not material." Pl.-Intvs.' Mem. 18.   In other words, the company argues that any discrepancies between the customer mill test certificates it prepared and the mill certificates prepared by its suppliers were immaterial because both indicated that the steel met the customers' requirements.

Jiulong's contention misses the point.   Regardless of whether steel used to make the grates was satisfactory to Jiulong's customers, the two certificate sets were inconsistent with respect to whether steel strip or steel sheet was used in the grates' manufacture.   It is the valuation of the steel input that matters for purposes of this case, not whether Jiulong's products met its customers' requirements.

Moreover, Commerce must identify inputs with specificity in order to properly value the company's factors of production and accurately calculate dumping margins.   In calculating dumping margins, Commerce often identifies each unique product sold in the United States by a "control number" or "CONNUM" for price comparison.   This is because there may be a range of products that might fall within the scope of an antidumping duty investigation.   One method used by Commerce to accurately compare the normal value and export price for imports covered by the investigation is to assign a CONNUM to each unique product, with product uniqueness being determined based on physical product characteristics.   For example, steel grating products may be made from different kinds of steel, which would indicate that different grating products, although all falling within the scope of the order, have specific factors of production that are unique from one another in terms of quality and cost.   Because some of these specific factors of production may cost more than others, Commerce compares the U.S. sales price and factors of production for unique products, i.e., those with the same CONNUMs, to obtain the most accurate dumping margins. *See Union Steel v. United States,* 36 CIT __, __, 823 F. Supp. 2d 1346, 1351

(2012).  Here, for example, the values for steel strip and steel sheet were markedly different and so it mattered which was used to make the grates.

As the Department found in this case, "[w]ithout a reliable mill test certificate on the record, the Department does not have sufficient information on the record to know whether or not [] Jiulong has correctly reported U.S. sales models with an accurate [CONNUM]."  AFA Memo at 11.  Commerce reached this conclusion because "mill test certificates is [sic] the primary document used to certify the properties of steel products.  Mill test certificates typically contain the most specific, and detailed description of a steel product that can be obtained."  AFA Memo at 13.

Jiulong disputes Commerce's determination, insisting that "[m]ill certificates never support U.S. sales quantities," but rather, sales quantities are determined by "U.S. customer's purchase orders and payments."  Pl.-Intvs.' Mem. 16.  Indeed, there is at least an unexplained suggestion in Commerce's Issues and Decision Memorandum that quantity was a concern with respect to its efforts to identify plaintiff's products by CONNUM.  In its Issues and Decision Memorandum, Commerce says "[w]ithout a reliable mill test certificate on the record, the Department does not have sufficient information on the record to know whether or not [] Jiulong has correctly reported U.S. sales models with an accurate [CONNUM], and further determine whether each U.S. sales observation is correctly reported with respect to quantity."  Issues & Dec. Mem. at 13.  It is unclear, however, why the lack of reliable mill test certificates would prevent the Department from accurately determining the quantity of Jiulong's U.S. sales.  Commerce principally found, however, that it required the mill certificates to verify the factors of production, i.e., the steel inputs, for Jiulong's products sold in the United States, not to verify the quantity of goods sold to each customer.  In other words, whether the company's U.S.

customers received the number of units set forth in a purchase order does not confirm the type of

steel used in manufacturing the grates that were delivered.  As Commerce found,

> because the only record evidence submitted by [] Jiulong to establish the types of
> steel consumed contains false information and cannot be relied upon, the
> Department is unable to determine the actual types of steel consumed (which
> constitutes [the vast majority] of the steel grating [normal value]) by [] Jiulong in
> its production of steel grating, which is the first product characteristic in the
> Department's CONNUM.

AFA Memo at 14.  Therefore, it was reasonable for the Department to conclude that the absence

of reliable mill certificates precluded it from calculating the normal value of Jiulong's

merchandise.

Finally, the Department concluded that Jiulong provided information that could not be

verified by the Department because,

> [b]y discovering the existence of a second set of mill test certificates at this late
> stage of the proceeding, the Department is effectively deprived from any
> meaningful opportunity to verify any of the factual information [] Jiulong
> submitted in response to the Department's post-verification requests.  The
> Department cannot begin to discern the composition and specifications of []
> Jiulong's steel inputs at this late stage of the proceeding.

AFA Memo at 12.  Thus, Commerce found that "the Department cannot properly value []

Jiulong's major steel inputs for producing steel grating and construct an accurate and reliable

margin.  Accordingly, Jiulong's recent admission to contradictory sets of mill test certificates is

information that cannot be verified" within the meaning of section 1677e(a)(2)(C).  AFA Memo

at 12-13.

For Jiulong, "[t]he Court should find incredulous the Department's sudden amnesia with

respect to physical verification."  Pl.-Intvs.' Mem. 17.  Jiulong insists that the Department's

verifiers could have identified the type of steel used in manufacturing the subject merchandise

based on their observations upon arrival at the company's warehouse.  According to Jiulong, the

verifiers "walked the factory yard multiple times . . . and witnessed that the names of the . . . hot

rolled coil producers were stenciled in paint directly on the huge coils of steel." Pl.-Intvs.' Mem.

7. Jiulong appears to be arguing that the ability to identify the producers of the steel coil gave

the Department the means to verify the steel's properties. The company insists, therefore, that

"the Court should reject in the strongest terms the Department's implied inability to recognize

. . . the hot-rolled coil laying around by the ton in the factory yard at verification." Pl.-Intvs.'

Mem. 17.

Jiulong's claims regarding "physical verification" must be rejected. The Department's

verification is conducted after the close of the POI. Accordingly, Commerce's verification

team's observation of physical stocks of particular steel in a respondent's warehouse during

verification is no reason to conclude that the same materials were used in manufacturing the

subject merchandise during the POI. As the Department noted, "verifications occurred more

than eight months after the end of the POI and therefore are not meaningful for the purpose of

supporting the specifications of [] Jiulong's steel inputs during the POI." AFA Memo at 13.

Here, it was only at verification that Jiulong revealed the existence of the customer mill test

certificates, which were at odds with the supplier mill test certificates produced during the

investigation itself. The Department was not unreasonable in determining that it could not verify

Jiulong's steel inputs so late in the proceedings.

The Department further concluded that Jiulong "failed to cooperate by not acting to the

best of its ability to comply" with requests for information during the course of the investigation,

warranting the application of AFA under 19 U.S.C. §1677e(b). According to Commerce,

> Jiulong did not act to the best of its ability to cooperate when it did not disclose
> the existence of the mill test certificates that it provides to its clients to the
> Department, due to the fact that these documents revealed [] Jiulong's awareness
> that other information submitted to record was false. . . . [W]e find that
> [Jiulong's] pattern of behavior in failing to promptly alert the Department to
> problems in its supporting documentation or even the existence of certain mill

certificates evinces a failure to put forth its maximum effort.  The Department is especially troubled by what appears to have been deliberate concealment on the part of [] Jiulong with respect to the mill test certificates issued for U.S. sales.

Issues & Dec. Mem. at 15-16.

The foregoing facts available discussion clearly demonstrates that Jiulong had two sets of documents relating to the steel used to make its grates.  By not providing the customer mill test certificates when it produced the supplier mill test certificates for the Department's review, Jiulong failed to "cooperate to the best of its ability" to provide requested information.  *Nippon Steel,* 337 F.3d at 1381.  That is, Jiulong did not "do the maximum" it was able to do when responding to the Department's questionnaires.  Thus, Commerce's decision to apply AFA to the steel input, based on Jiulong's failure to cooperate to the best of its ability to comply with requests for information, was supported by substantial evidence.

C.  The Department's Determination to Deny Jiulong Separate-Rate Status
Was Not Supported By Substantial Evidence

In addition to concluding that it would determine Jiulong's dumping margin based on AFA, Commerce found that "the nature of [] Jiulong's unreliable submissions . . . calls into question the reliability of the separate rates questionnaire responses submitted by [] Jiulong in this investigation."  Issues & Dec. Mem. at 15-16.  Based on this finding, the Department determined that "Jiulong is part of the PRC-wide entity for purposes of this investigation, as [] Jiulong in its action (and inaction) has failed to demonstrate that it operates free from government control."  Issues & Dec. Mem. at 17.  Accordingly, Jiulong was assigned the PRC-wide rate of 145.18%, which was equal to the highest rate in the petition.  Xinke and Jiulong challenge this determination as improper.  The court agrees.

This Court has consistently held that it is unreasonable for Commerce to impute the unreliability of a company's questionnaire responses and submissions concerning its factors of production and/or U.S. sales to its separate-rate responses when there is no evidence on the record indicating that the latter were false, incomplete, or otherwise deficient. *See, e.g., Shandong Huarong Gen. Group Corp. v. United States,* 27 CIT 1568, 1595-96 (2003) (not reported in Federal Supplement) ; *Gerber Foods*, 29 CIT at 772, 387 F. Supp. 2d at 1287; *Qingdao Taifa Group Co. v. United States*, 33 CIT __, __, 637 F. Supp. 2d 1231, 1240-41 (2009); *Since Hardware Co. Ltd. v. United States*, 34 CIT __, __, Slip Op. 10-108, at 16 (2010) ("Commerce has found that [respondent's] responses failed to report accurately information, such as prices and country of origin, for inputs purchased in market economy countries. The Department, however, made no specific finding that the responses concerning state control were inaccurate. . . . Consequently, remand is warranted.").  Because Commerce has made no finding that Jiulong's questionnaire responses concerning its separate rate status were deficient in any respect, the Department's conclusion that the company was part of the PRC-wide entity is unsupported by substantial evidence.  Accordingly, the Department is required to determine Jiulong's separate rate based on the company's questionnaire responses.

As noted, under section 1677e(c), the Department is required to corroborate any separate rate assigned to Jiulong as AFA.  "Corroborate means that [Commerce] will examine whether the secondary information to be used has probative value."  19 C.F.R. § 351.308(d).  To corroborate its selection of an AFA rate, Commerce must therefore demonstrate that the rate is reliable and relevant to the particular respondent.  *Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319, 1325 (Fed. Cir. 2010) ("Substantial evidence requires Commerce to show some relationship between the AFA rate and the [respondent's] actual dumping margin."); *Mittal*

*Steel Galati S.A. v. United States*, 31 CIT 730, 734, 491 F. Supp. 2d 1273, 1278 (2007) (citations omitted) ("Commerce assesses the probative value of secondary information by examining the reliability and relevance of the information to be used.").  Furthermore, "[i]n order to corroborate an AFA rate, Commerce must show that it used 'reliable facts' that had 'some grounding in commercial reality.'"  *Qingdao Taifa*, 35 CIT at __, 780 F. Supp. 2d at 1348 (quoting *Gallant Ocean*, 602 F.3d at 1324).  Hence, the corroboration requirement is designed to ensure that an AFA rate is "a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance."  *F.lli De Cecco Di Fillip Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000).

Petitioners argue that, under the peculiar circumstances of this case, Commerce's determination to assign Jiulong the rate of 145.18% should nonetheless be sustained because this rate was corroborated based on Jiulong's own data.  In other words, Petitioners argue that even if the company were found to be entitled to a separate rate, Jiulong would have received the 145.18% margin as AFA.  To support this contention, Petitioner's point to the Department's finding that "the margin of 145.18 percent had probative value because it was in the range of CONNUM model margins we found for the only participating mandatory respondent, [] Jiulong. Accordingly, we found that the rate of 145.18 percent was corroborated within the meaning of [19 U.S.C. § 1677e(c)]."  Issues & Dec. Mem. at 19.  Thus, Petitioners insist that the 145.18% rate was corroborated for Jiulong because, although taken from the petition, Commerce found this rate to be within the "range" of margins calculated for Jiulong's merchandise.  For Petitioners, Jiulong's entitlement to a separate rate is immaterial because that status would not ultimately affect its rate.

Petitioners' contention assumes that the administrative record is sufficient to corroborate the AFA rate assigned to Jiulong even if the company is not treated as part of the PRC-wide entity.  Commerce, however, has not purported to corroborate the 145.18% rate as a separate rate for Jiulong.  For instance, an individual AFA rate must reflect the "commercial reality" of the particular respondent in order to be corroborated.  *Gallant Ocean*, 602 F.3d at 1324.  In addition, the rate chosen may not be aberrational or punitive.  *De Cecco*, 216 F.3d at 1032 (noting that Commerce's discretion is restrained because the purpose of the AFA statute "is to provide respondents with an incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins").  In the Final Results, Commerce did not offer any analysis with respect to these or other issues specific to determining a separate rate for Jiulong.  Therefore, this matter must be remanded for further consideration of the AFA rate to be determined for Jiulong.

CONCLUSION and ORDER

Based on the foregoing, Commerce's determination to assign the average petition rate to the Separate Rate Respondents, without considering surrogate data placed on the record during the course of the investigation, was unreasonable.  In addition, although the use of AFA in determining the value of Jiulong's steel inputs was lawful and supported by substantial evidence, the Department's decision to disregard other information on the record, including the company's separate-rate questionnaires, was unsupported by substantial evidence.

For the reasons stated, it is hereby

ORDERED that, upon remand, Commerce issue a redetermination that complies in all respects with this Opinion and Order, is based on determinations that are supported by substantial record evidence, and is in all respects in accordance with law; it is further

ORDERED that Commerce, in preparing the Remand Redetermination, shall reexamine the surrogate value data on the record, and determine an antidumping margin for the Separate Rate Respondents that is reasonable in light of the Department's duty to determine rates as accurately as possible; it is further

ORDERED that the Department determine a separate rate for Jiulong that is corroborated as required by 19 U.S.C. § 1677e(c);  it is further

ORDERED that the Department explain how the discrepancies between Jiulong's supplier mill test certificates and those the company prepared for its customers justified using facts available or AFA to determine the quantity of Jiulong's U.S. sales; it is further

ORDERED that the Department may reopen the record to solicit any information it determines to be necessary to make its determination; it is further

ORDERED that the remand result shall be due on November 19, 2012; comments to the remand results shall be due thirty (30) days following filing of the remand results; and replies to such comments shall be due fifteen (15) days following filing of the comments.

_____/s/ Richard K. Eaton_____<br>
Richard K. Eaton

Dated: July 18, 2012
       New York, New York