Slip Op. 14-38

UNITED STATES COURT OF INTERNATIONAL TRADE

_____

|   |   |
|---|---|
| YANTAI XINKE STEEL STRUCTURE CO., LTD., | : |
| | : |
| Plaintiff, | : |
| | : |
| and | : |
| | : |
| NINGBO JIULONG MACHINERY CO., LTD. and NINGBO HAITIAN INTERNATIONAL CO., LTD., | : |
| | : |
| Plaintiff-Intervenors, | : |
| | : |
| v. | : |
| | : |
| UNITED STATES, | : |
| | : |
| Defendant, | : |
| | : |
| and | : |
| | : |
| ALABAMA METAL INDUS. CORP. and FISHER AND LUDLOW, | : |
| | : |
| Defendant-Intervenors. | : |

Before: Richard K. Eaton, Judge

Court No. 10-00240

_____

## OPINION

[The Department of Commerce's Final Results of Redetermination are sustained.]

Dated: April 9, 2014

*David J. Craven*, Riggle & Craven, of Chicago, IL, argued for plaintiff.

*Michael D. Snyder*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant.  With him on the brief were *Stuart F. Delery*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Franklin E. White, Jr.*, Assistant Director.  Of counsel on the brief was *Scott D. McBride*, Senior Attorney, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of Washington, D.C.

*Timothy C. Brightbill*, Wiley Rein, LLP of Washington, D.C., argued for defendant-intervenors.  With him on the brief were *Alan H. Price* and *Christopher B. Weld*.

EATON, Judge:  Before the court are the Department of Commerce's ("the Department" or "Commerce") final results following remand of its antidumping investigation of certain steel grating exported from the People's Republic of China ("PRC") made pursuant to the court's order issued in *Yantai Xinke Steel Structure Co. v. United States*.  *See Yantai Xinke Steel Structure Co. v. United States*, 36 CIT __, Slip Op. 12-95 (July 18, 2012) ("*Yantai I*"); Final Results of Redetermination Pursuant to Ct. Remand (Dep't of Commerce July 18, 2012) (ECF Dkt. No. 83) ("Remand Results").

On remand, Commerce was instructed to (1) reexamine the surrogate value data on the record, and determine a more accurate antidumping margin for separate rate respondents Yantai Xinke Steel Structure Co., Ltd. ("Xinke" or "plaintiff") and Ningbo Haitian International Co., Ltd. ("Haitian") using surrogate value information that was more contemporaneous with the period of investigation ("POI");[1] (2) "determine a separate rate for [mandatory respondent Ningbo Jiulong Machinery Manufacturing Co., Ltd. ('Jiulong')] that is corroborated as required by 19 U.S.C. § 1677e(c) [(2006)];" and (3) "explain how the discrepancies between Jiulong's supplier mill test certificates [submitted to Commerce] and those the company prepared for its customers justified using facts available or [adverse facts available ('AFA')] to determine the quantity of Jiulong's U.S. sales."  *Yantai I*, 36 CIT at __, Slip Op. 12-95, at 12, 30.  The court

---

[1]       The POI was October 1, 2008 through March 31, 2009.  *Yantai I*, 36 CIT at __, Slip Op. 12-95, at 2.

also permitted the Department to "reopen the record to solicit any information it determine[d] to be necessary to make its determination." *Yantai I*, 36 CIT at __, Slip Op. 12-95, at 30.

In its Final Determination, Commerce assigned a separate antidumping duty margin of 136.76 percent for Xinke and Haitian, using the average of the margins alleged in the Petition,[2] and assigned mandatory respondent Jiulong the PRC-wide rate of 145.18 percent utilizing AFA. *Certain Steel Grating From the PRC*, 75 Fed. Reg. 32,366, 32,368, 32,369 (Dep't of Commerce June 8, 2010) (final determination of sales at less than fair value), and the accompanying Issues & Dec. Mem., A-570-947 (Dep't of Commerce May 28, 2010) (P.R. Doc. 229) ("Issues & Dec. Mem.") (collectively, the "Final Determination").

In the Remand Results, the Department "complied under protest with the [c]ourt's order . . . [w]ith respect to the calculation of a separate rate for Xinke and Haitian, . . . and reviewed the [surrogate value] data placed on the administrative record after the initiation of the investigation." Remand Results at 2. As instructed by the court, Commerce used more contemporaneous surrogate values data from the record to calculate a revised weighted-average dumping margin of 38.16 percent for separate rate respondents Xinke and Haitian. Remand Results at 4, 7. Additionally, the Department determined a separate rate for Jiulong. Remand Results at 8–9. Despite assigning Jiulong a separate rate, however, the rate itself remained unchanged at "145.18 percent, the highest rate alleged from the [P]etition."[3] Remand Results at 8; Final Determination, 75 Fed. Reg. at 32,369. The Department also provided additional

---

[2]     As will be explained in greater detail below, Commerce made adjustments to the margins before averaging them.

[3]     Based on data supplied by defendant-intervenors in the Petition, "the estimated dumping margins for [certain steel grating] from the PRC range[d] from 131.51 percent to 145.18 percent." *Certain Steel Grating from the PRC*, 74 Fed. Reg. 30,273, 30,276–77 (Dep't of Commerce June 25, 2009) (initiation of antidumping duty investigation) ("Notice of Initiation").

explanation as to why Jiulong's defective "mill test certificates prevented [Commerce] from accurately determining the quantity of Jiulong's U.S. sales," and why this submission warranted the application of AFA to the quantity of Jiulong's U.S. sales.  Remand Results at 11, 36.

Plaintiff Xinke and defendant-intervenors, Alabama Metal Industries Corporation and Fisher and Ludlow (collectively, "defendant-intervenors"),[4] filed comments to the Remand Results.  For the following reasons, the court holds that Commerce's determination of a margin for Xinke and Haitian, and the separate AFA rate for Jiulong are supported by substantial evidence and otherwise in accordance with law.  In addition, Commerce has adequately explained why the lack of reliable mill test certificates prevented it from accurately determining the quantity of Jiulong's U.S. sales and warranted the use of AFA with respect to Jiulong's sales volume.  Thus, the Remand Results are sustained.

## STANDARD OF REVIEW

"The court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i) (2006).  "The results of a redetermination pursuant to court remand are also reviewed for compliance with the court's remand order."  *Xinjiamei Furniture (Zhangzhou) Co. v. United States*, 38 CIT __, __, Slip Op. 14-17 (Feb. 18, 2014) (citation omitted) (internal quotation marks omitted).

---

[4]     Defendant-intervenors are domestic producers of steel grating.

## DISCUSSION

### I.   BACKGROUND

In 2009, Commerce initiated an investigation of producers of steel grating from the PRC

to determine whether the subject merchandise was being sold in the United States at less than fair

value.  *See* Notice of Initiation, 74 Fed. Reg. at 30,273–74.  As part of its investigation,

Commerce selected two mandatory respondents, Shanghai DAHE Grating Co., Ltd. ("Shanghai

DAHE") and Jiulong.  *See* Certain Steel Grating From the PRC, 75 Fed. Reg. 847, 847 (Dep't of

Commerce Jan. 6, 2010) (prelim. determination of sales at less than fair value and postponement

of final determination) ("Preliminary Determination").  Shanghai DAHE did not respond to

Commerce's questionnaires, nor did it otherwise participate in the investigation.  Preliminary

Determination, 75 Fed. Reg. at 847.  As a result, Jiulong was the sole mandatory respondent.[5]

*See* Preliminary Determination, 75 Fed. Reg. at 847, 851.

In the Final Determination, the Department found that Jiulong had supplied inaccurate

mill test certificates to Commerce, thereby withholding requested information, impeding the less

than fair value investigation, providing information that could not be verified, and failing to

cooperate to the best of its ability.  *See* Final Determination, 75 Fed. Reg. at 32,367.  Commerce

therefore assigned Jiulong a rate based on AFA.  Final Determination, 75 Fed. Reg. at 32,367.

Commerce further determined that, as a result of Jiulong's inaccurate mill test certificates, it

could not rely on the information provided by Jiulong in its separate rate questionnaire and,

consequently, as an adverse inference, found that Jiulong was part of the PRC-wide entity.  Final

Determination, 75 Fed. Reg. at 32,367.  Accordingly, the Department assigned Jiulong the PRC-

wide rate of 145.18 percent.  Final Determination, 75 Fed. Reg. at 32,369.

---

[5]       As noted in *Yantai I*, although Commerce did not select a mandatory respondent
to replace Shanghai DAHE, no party challenged this decision.  *Yantai I*, 36 CIT at __, Slip Op.
12-95, at 3 n.3.

Because Jiulong was the sole mandatory respondent, and its rate was determined using AFA, Commerce, pursuant to its regulations, decided to use a "reasonable method" to determine the rates of the non-mandatory respondents.  Issues & Dec. Mem. at 33; *see* 19 U.S.C. § 1673d(c)(5)(B) (2006).  Specifically, Commerce determined a rate of 136.76 percent for separate rate respondents Xinke and Haitian, based on a simple average of the five dumping margins alleged in defendant-intervenors' Petition seeking the initiation of the less than fair value investigation.  Final Determination, 75 Fed. Reg. at 32,368.

Xinke, Haitian, and Jiulong, each exporters of steel grating from the PRC, challenged Commerce's actions in *Yantai I.*  In particular, Xinke objected to Commerce's use of a simple average of the margins alleged in the Petition to determine the margins for the non-mandatory respondents.  *See Yantai I*, 36 CIT at __, Slip Op. 12-95, at 8.  Xinke "argued that the normal value [of grated steel exports from the PRC used to calculate the Petition rates] 'should be recalculated using the [surrogate values] for financial ratios, material inputs, energy, and packing materials that ha[d] been submitted for the record in this case."  *Id.* at __, Slip Op. 12-95, at 8 (quoting Issues & Dec. Mem. at 32).  Xinke claimed that Commerce ignored more contemporaneous data, specific to the POI, that Xinke had placed on the record during the investigation, from which the Department could have adjusted the Petition rates and thus, determined a more accurate antidumping margin for the non-mandatory respondents.  *Id.* at __, Slip Op. 12-95, at 8.

In addressing this argument, the court found that the Department "had record evidence before it that may well have assisted in determining an accurate rate for the [s]eparate [r]ate [r]espondents[, Xinke and Haitian]."  *Id.* at __, Slip Op. 12-95, at 12.  The court elaborated that, "[f]or instance, it appears that Commerce relied on [P]etition rates that were calculated using

financial ratios for the year prior to the POI, when financials for the POI were on the record." *Id.*

Thus, the court concluded that the Department's "decision to ignore readily available and

possibly more reliable surrogate value information when assigning an antidumping duty rate was

not a reasonable one." *Id.* The case was then remanded to the Department "to determine

whether a more accurate antidumping margin could be assigned based on the surrogate data

submitted during the investigation." *Id.*

In addition, Jiulong challenged Commerce's determination regarding the quantity of

Jiulong's U.S. sales in the Final Determination. *Id.* at __, Slip Op. 12-95, at 23. In particular,

Jiulong objected to the application of facts available and AFA to determine the quantity of its

U.S. sales based on the unreliability of its supplier mill test certificates. The court agreed,

finding that "[i]t [was] unclear . . . why the lack of reliable mill test certificates would prevent

the Department from accurately determining the quantity of Jiulong's U.S. sales." *Id.* The court

consequently remanded the issue to Commerce, seeking further clarification from the

Department as to "how the discrepancies between Jiulong's supplier mill test certificates and

those the company prepared for its customers justified using facts available or AFA to determine

the quantity of Jiulong's U.S. sales." *Id.* at __, Slip Op. 12-95, at 30.

Further, Jiulong challenged Commerce's denial of separate rate status without

considering Jiulong's questionnaire responses concerning its independence from Chinese

government control. *See id.* at __, Slip Op. 12-95, at 26. In doing so, Jiulong argued that it was

improper to extend the finding that its mill test certificates were unreliable, to a finding that the

responses provided in the separate rate questionnaire were unreliable as well. *See id.* The court

agreed, holding that "Commerce ha[d] made no finding that Jiulong's questionnaire responses

concerning its separate rate status were deficient in any respect. . . . Accordingly, the Department

is required to determine Jiulong's separate rate based on the company's questionnaire responses." *Id.* at __, Slip Op. 12-95, at 27.


## II.   REMAND RESULTS – UNCONTESTED DETERMINATIONS

### A.   Relevancy of Mill Test Certificates to Quantity of U.S. Sales

In the Remand Results, Commerce addressed the adequacy of the inaccurate mill test certificates to provide the substantial evidence needed to support the use of facts available and AFA when determining the volume of Jiulong's U.S. sales.  Remand Results at 9–11.  Jiulong's mill test certificates were requested by Commerce during its investigation as a means of establishing the type of hot-rolled steel inputs used to manufacture Jiulong's steel grating "in order to properly value the company's factors of production and accurately calculate dumping margins."  *Yantai I*, 36 CIT at __, Slip Op. 12-95, at 22.  In the Final Determination, the Department found that Jiulong had provided inaccurate mill test certificates to Commerce, and the Department was therefore unable to verify the type of steel inputs used by Jiulong in the manufacturing of its steel grating.  *See* Issues & Dec. Mem. at 12–13.  "Without a reliable mill test certificate on the record," the Department explained, Commerce "d[id] not have sufficient information on the record to know whether or not . . . Jiulong ha[d] correctly reported U.S. sales models . . . *and further determine whether each U.S. sales observation* [*was*] *correctly reported with respect to quantity*."  Issues & Dec. Mem. at 13 (emphasis added).  It was the finding with respect to quantity that the court questioned in *Yantai I*.

On remand, Commerce clarified that, in constructing comparison U.S. prices, the physical characteristics of the product determine both the price and quantity used to calculate a weighted average.  Remand Results at 10–11 ("The inaccuracy of the reported steel-type

physical characteristic is significant. . . . If . . . one of the physical characteristics has been falsely

reported, . . . [t]his will result in not only an inaccurate average U.S. price, but also an inaccurate

U.S. sales quantity for the averaging group [of sales], which is used when aggregating

comparison results to calculate the weighted-average dumping margin for Jiulong.").  In other

words, without reliable mill test certificates, the Department was unable to determine the type of

steel used to manufacture Jiulong's steel grating merchandise sold in the United States.  This

affected Commerce's ability to determine quantity, because products with different principal

physical characteristics could be erroneously grouped together and thus wrongly accounted for.

This erroneous grouping would lead to an inaccurate representation of U.S. sales and an

inaccurate dumping margin.  Because Commerce's explanation is reasonable and because no

party contests this finding, it is sustained.


##### B.        Jiulong's Separate Rate Status

In compliance with the court's order in *Yantai I*, on remand the Department reexamined

the information in Jiulong's separate rate response without consideration of Jiulong's submission

of inaccurate supplier mill test certificates.  Remand Results at 8.  Finding "Jiulong's separate

rate information to be complete," the Department "grant[ed] Jiulong a separate rate in

accordance with the [c]ourt's direction."  Remand Results at 8.  As noted, despite assigning

Jiulong a separate rate on remand, based on the application of AFA, Jiulong's antidumping duty

rate remained unchanged at 145.18 percent, the highest margin from the Petition, as revised by

the Department through supplemental questionnaires.  Remand Results at 8; Issues & Dec. Mem.

at 18.

The determination to grant Jiulong a separate rate has not been contested, and based on

the reasonable explanation found in the Remand Results, the court sustains it.


**III.    THE SEPARATE RATE ASSIGNED TO JIULONG IS REASONABLE**

In accordance with the court's direction to corroborate the separate rate assigned to

Jiulong in the Remand Results, Commerce "determined that the rate of 145.18 percent, the

highest rate alleged from the [P]etition, [as revised through supplemental questionnaires, was]

both reliable and relevant to Jiulong's own reported commercial experience, and, therefore . . .

corroborated pursuant to [19 U.S.C. § 1677e(c)]."  Remand Results at 8.  "In order to corroborate

this rate, the Department . . . found that the 145.18 percent rate from the [P]etition [was] lower

than three [of the five] product-specific dumping margins, and [was] thus within the range of the

product-specific dumping margins from the [P]reliminary [D]etermination for Jiulong's sales of

steel grating during the POI."  Remand Results at 8–9.

The Department explained further that, because Jiulong had provided "falsified

documents regarding its hot-rolled steel inputs during the investigation," it was reasonable to

presume that had Jiulong reported accurate information to the Department, "dumping margins

would have been even higher than those calculated in the Preliminary Determination based on

Jiulong's reported, falsified data."  *See* Remand Results at 9.  In other words, Commerce inferred

from Jiulong's submission of inaccurate mill test certificates that the submission of accurate

documents would have resulted in the calculation of a higher dumping margin.

Because Jiulong has not contested the assignment of the 145.18 percent rate, and because

the rate is lower than three of five of the price-to-normal value dumping margins used in the

Petition, the court finds the rate reasonable and therefore sustains the assignment of the rate.  To

the extent the Department rests its determination to use the 145.18 percent rate on the mill test

certificates, however, it stretches a point.  That is, the circumstances surrounding the submission

of the questionable mill test certificates do not necessarily warrant an inference that Jiulong

knowingly submitted them in order to obtain a lower rate.  *See Yantai I*, 36 CIT at __, Slip Op.

12-95, at 18–22.


IV.     **REMAND RESULTS – CONTESTED DETERMINATIONS**

   **A.  Commerce's Selection of Wide-Gauge Steel Coils Is Sustained**

   In the Final Determination, because Jiulong was the sole mandatory respondent, and its

rate was determined using AFA, Commerce sought to use a "reasonable method" to determine

the rates of the non-mandatory respondents pursuant to 19 U.S.C. § 1673d(c)(5)(B).[6]  There, the

Department found reasonable the use of the five price-to-normal value dumping margins set

forth in the Petition (with some adjustments).  The Department used a simple average of those

margins to assign the separate rate of 136.76 percent for Xinke and Haitian.  Issues & Dec. Mem.

at 33.  For use in its price-to-normal value calculation, defendant-intervenors computed the

normal value of grated steel exports from the PRC using "factors of production data from

comparable U.S. steel producers regarding raw material quantities, labor consumption, and

energy consumption."  *Yantai I*, 36 CIT at __, Slip Op. 12-95, at 8 n.7.  These factors of

---

[6]     The statute reads as follows:
       If the estimated weighted average dumping margins established for all
exporters and producers individually investigated are zero or de minimis margins,
or are determined entirely under section 1677e of this title [(i.e., using AFA)], the
administering authority may use any reasonable method to establish the estimated
all-others rate for exporters and producers not individually investigated, including
averaging the estimated weighted average dumping margins determined for the
exporters and producers individually investigated.
19 U.S.C. § 1673d(c)(5)(B).

production were then valued by defendant-intervenors "using publicly available surrogate data

from India, including information from the Global Trade Information Service's Global Trade

Atlas database." *Id.*

To value "factory overhead, selling, general and administrative expenses, and profit," in

their Petition, defendant-intervenors used the 2006–2007 financial statements of an Indian

producer of welded pipe, Bihar Tubes Limited ("Bihar"), and an Indian producer of welded line

pipes, Jindal SAW Limited ("Jindal"). *Id.* In the preliminary and final determinations, however,

the Department declined to use the financials used by defendant-intervenors. Instead, Commerce

calculated the financial ratios using the financial statements of two different Indian companies

for the fiscal year 2007–2008, Mekins Agro Products Limited ("Mekins") and Rama Steel

Tubes Limited ("Rama"). Preliminary Determination, 75 Fed. Reg. at 854–55. As noted,

Commerce then averaged the resulting rates to determine the margin for the separate rate

respondents.

Now, in the Remand Results, Commerce has assigned Xinke and Haitian a revised

dumping margin of 38.16 percent. Remand Results at 7. Here, it determined Xinke and

Haitian's rate using a weighted-average of the five price-to-normal value dumping margins

originally found in the Petition. Mem. from Robert Bolling, Program Manager, Import

Administration, and Thomas Martin, International Trade Compliance Analyst, Import

Administration, to the File at 2, PD 24 at bar code 3115630-01 (Jan. 18, 2013), ECF Dkt. No.

107-24 (July 31, 2013) ("Calculation Mem."). The Department, however, adjusted these

margins by using alternative surrogate value information. Remand Results at 4–7. Thus, the

Department reexamined the surrogate values used to calculate the Petition dumping margins, and

"determined that there [were] more contemporaneous [surrogate values] on the record for some

of the factors of production . . . used to calculate the [P]etition margins." Remand Results at 4.

The Department then "updated the [surrogate values] in the [P]etition with more

contemporaneous information [specific to the POI] for hot-rolled steel coil, . . . steel scrap, wire

rod, electricity, labor, and the ratios from the financial statements for overhead, selling expenses,

general and administrative expenses, and profit." Remand Results at 4–5. Commerce explained

further that, for the surrogate values "based on import data, the Department only updated

[surrogate values] where the record contained data from the interested parties which

corresponded to the descriptions for the [factors of production] from the [P]etition." Remand

Results at 5. Although the Department updated the surrogate values, it retained the factors of

production (i.e., the individual inputs) from the Petition.

        As part of this update, Commerce used Indian import data for hot-rolled steel coil that

was derived from tariff schedule subheadings for wide-gauge steel coils. The Department then

used that data as the basis for the surrogate valuation of the steel coil input. *See* Remand Results

at 4–5. Defendant-intervenors had identified wide-gauge steel as a factor of production used to

calculate the margins in the Petition. For this factor of production, Commerce "update[d] one of

the three [Harmonized Tariff Schedule ('HTS')] subheadings (i.e., 7208.37.30) used in the

[P]etition for the Indian import data as the basis for [hot-rolled steel coil] because only this HTS

subheading had more contemporaneous data on the record." Remand Results at 5. Thus, "[t]he

Indian import data for [the] remaining two HTS subheadings (i.e., 7208.37.10 and 7208.37.90)

for the [surrogate value] for hot-rolled steel coil from the [P]etition . . ." remained unchanged.

Remand Results at 5.

        Before Commerce, and now here, plaintiff insists that the proper input was narrow-gauge

steel coil, not wide-gauge. Commerce, however, declined to "consider[] using the Indian import

data for HTS subheadings 7211.14.50 and 7211.19.50" (i.e., narrow-gauge steel coil) because

doing so "would involve a redefinition of the [P]etition's [factors of production] for hot-rolled

steel coil."  Remand Results at 16–17.  Commerce explained that using alternative tariff

provisions to base the surrogate values would extend "beyond the instructions from the [c]ourt in

updating the [surrogate values] for the [P]etition margins where appropriate."  Remand Results at

17.  Put another way, the Department contends that the court's remand order directed it to update

the values for the factors of production, but not to reevaluate the factors themselves.

        In making its argument, Xinke contends that the issue of the proper tariff provision for

the hot-rolled strip was before the Department in the original investigation.  Xinke's Cmts. on

Remand Determination 4 (ECF Dkt. No. 85) ("Pl.'s Cmts.").  Further, plaintiff notes that

Commerce was instructed on remand "to consider the complete record in order to determine

whether a more accurate antidumping margin could be assigned based on the surrogate data

submitted during the investigation."  *Yantai I*, 36 CIT at __, Slip Op. 12-95, at 12.  Thus, "Xinke

submits that the Department . . . should have [also revisited], and then corrected, the tariff

provision" used as the basis for surrogate values for the steel coil.  Pl.'s Cmts. 3; Remand Results

at 12–13.  Therefore, while not objecting to the values being made more contemporaneous to the

POI, Xinke claims that Commerce used the wrong type of steel as a factor of production in the

production of the steel grating, and should have corrected its error on remand.

        During the investigation, Jiulong supplied values for narrow-gauge subheadings (i.e.,

HTS 7211.14.50 and 7211.19.50) in its mill test certificates that were used to value the hot-rolled

steel coil in the Preliminary Determination.  Pl.'s Cmts. 6.  Xinke contends that, in order to value

the steel input used in the manufacturing of the subject merchandise, Commerce should have

used the HTS headings covering the narrow-gauge steel found in Jiulong's mill test certificates

for the steel input.  Pl.'s Cmts. 6–7.  In support of its claim, plaintiff points to the verification

report which notes that representatives of Commerce measured steel coils at Jiulong's factory

and found that all of the coils were narrow-gauge.  Pl.'s Cmts. 6; *see* Mem. from Robert Bolling,

Program Manager, Thomas Martin, International Trade Compliance Analyst, and Brian Soiset,

Staff Attorney, Office of the Chief Counsel for Import Administration, to the File at 10, A-570-

947 (Feb. 23, 2010) (P.R. Doc. 164) ("Verification Report").  In addition, plaintiff argues that

there is no evidence on the record supporting the use of wide-gauge steel coils for steel grating

production in the PRC.  Pl.'s Cmts. 3–7.

     Despite plaintiff's arguments to the contrary, defendant-intervenors point to record

evidence that they claim demonstrates that wide-gauge steel is the input used in the

manufacturing of steel grating.  Defendant-intervenors argue that record evidence establishes, for

instance, that wide-gauge steel coils were used in the production of steel grating in the United

States.  *See* Def.-Ints.' Resp. to Pl.'s Cmts. on the Final Results of Redetermination Pursuant to

Ct. Remand 6 (EFC Dkt. No. 97) ("Def.-Ints.' Resp. Cmts.").

     Further, defendant-intervenors argue that there is record evidence that "steel producers do

not generally produce hot-rolled steel coil in narrow form," but rather "'most producers of steel

produce wide steel coil and slit it to size for use in products that require narrower coil, such as

steel grating.'"  Def.-Ints.' Resp. Cmts. 6 (quoting Aff. ¶¶ 3–4, at 40–41, A-570-947 (Dec. 7,

2009) (P.R. Doc. 124) ("[T]he commonly accepted practice is to purchase wide coils from a mill

and slit into widths less than 30[ inches] and then slit again into narrow bearing bar widths. . . .

[I]f a customer requests a coil of width less than 30 inches, it is customary for the steel producer

to produce a wide coil, and slit the coil for the customer.")).

As to the Department's verification of Jiulong, defendant-intervenors point out that company representatives for Jiulong were unable to say whether its purchased coils were rolled to a narrow size or slit from a larger coil.  Def.-Ints.' Resp. Cmts. 10; Verification Report at 10. Moreover, since the verification was conducted months after the Department's investigation, defendant-intervenors insist that the presence of narrow-gauge steel at Jiulong's factory is of little probative value.  *See* Def.-Ints.' Resp. Cmts. 11.  Further, defendant-intervenors argue that, because "Jiulong's falsification of [its mill test certificates] deprived the Department of the ability to verify the type of hot-rolled steel that the company used in its production of steel grating[,] . . . there is no basis on the record" to support a finding that Jiulong used narrow-gauge steel coils.  Def.-Ints.' Resp. Cmts. 10.

Defendant-intervenors further argue that Commerce's "use of narrow[-gauge steel coils] would require a redefinition of the Petition's [factors of production]."  Def.-Ints.' Resp. Cmts. 2. They contend that injecting "surrogate values from one production process into a production process that does not incorporate that input [would] fundamentally chang[e] the Petition's cost model" and "would require that it choose entirely different [factors of production] (*e.g.*, raw materials, electricity, labor, and yield losses) that corresponded to the production process incorporating narrow steel coil," thus "exceed[ing] the scope of the Court's instructions to the Department to update the surrogate values for the Petition margins where appropriate."  Def.-Ints.' Resp. Cmts. 8–9.

For its part, the Department contends that, upon review of all "of the surrogate value information on the administrative record," there was nothing that "undermined [defendant-intervenors'] claim that the factors reported in the [P]etition were the best available information on the factors of production from their surrogate for the PRC producer."  Def.'s Resp. to Cmts. Regarding the Remand Determination 8, 10 (ECF Dkt. No. 93) (internal quotation marks

omitted) ("Def.'s Resp. Cmts."). Echoing defendant-intervenors' argument, the Department

further maintains that "[a]pplying a surrogate value for a steel input with different widths from

the input actually used by the domestic producer—as Xinke argues—results in a normal value

derived from surrogate values based upon one production experience being applied to the factors

of production of another, different production experience," and thus, "go[es] 'beyond the

instructions from the Court.'" Def.'s Resp. Cmts. 9 (quoting Remand Results at 17).

Accordingly, defendant asserts that Commerce's determination "to continue using surrogate

values from the Indian HTS schedule [for wide-gauge steel] that correspond[ed] to the physical

characteristics of the hot-rolled steel in coils used by the domestic producer in producing steel

grating" was reasonable. Def.'s Resp. Cmts. 10.

     The court sustains the Department's use of wide-gauge steel coils as a factor of

production. While disputing the Department's decision to use wide-gauge steel coils for the steel

input, plaintiff has not been able to establish that the choice was unreasonable or not fully

explained. In other words, no usable record evidence undermines defendant-intervenors' claim

that the factors reported in the Petition were "the best available information on the [factors of

production] from their surrogate for a PRC producer at the time the [P]etition was filed."

Remand Results at 15; *see Peer Bearing Co.-Changshan v. United States*, 35 CIT __, __, 752 F.

Supp. 2d 1353, 1372 (2011) (explaining that the Department "must provide a rational

explanation for its choice"). That is, (1) there was evidence on the record that wide-gauge steel

was used as the input in the production of steel grating by a producer in the United States, *see*

Petition for the Imposition of Antidumping and Countervailing Duties Pursuant to Sections 701

and 731 of the Tariff Act of 1930, as Amended, Volume II at 101–04, A-570-947 (May 29,

2009) (P.R. Doc. 1); (2) there was evidence that the common industry practice is for companies

to purchase wide-gauge steel and slit it into narrow-gauge, Aff. ¶¶ 3–4 at 40–41; (3) during

verification, company representatives of Jiulong were unable to say whether its purchased coils

were rolled to a narrow size or slit from a larger coil, *see* Verification Report at 10;(4) because

verification of Jiulong's facility was conducted months after the close of the POI, the presence of

narrow-gauge coils on site is of little probative value, *see* Verification Report at 1; and (5)

because Jiulong's mill test certificates describing the specifications of its hot-rolled steel coil

were found to be inaccurate, and thus, unusable, there is no evidence on the record indicating

that Jiulong's merchandise, or that of any other Chinese manufacturer, was produced from

narrow-gauge steel.  In other words, the only usable evidence on the record is that wide-gauge

steel was used in the production of steel grating.  The court is constrained in its review to the

evidence on the record, and plaintiff has failed to produce any other evidence that narrow-gauge

steel was used in the production of steel grating by Jiulong itself, or elsewhere.

Moreover, plaintiff waived its claim that Commerce used the wrong type of steel for the

steel input by failing to raise it before the court prior to the remand.  Because plaintiff did not

raise this issue until after remand, the court's instructions necessarily did not direct the

Department to reconsider its selection of the input itself.  "A waiver is [ordinarily evidenced by]

an 'intentional relinquishment or abandonment of a known right or privilege.'"  *NSK Ltd. v.*

*United States*, 28 CIT 1535, 1555, 346 F. Supp. 2d 1312, 1330 (2004) (quoting *Johnson v.*

*Zerbst*, 304 U.S. 458, 464 (1938)).  In the court's order, Commerce was instructed to "reexamine

the surrogate value data on the record, and determine an antidumping margin for the [s]eparate

[r]ate [r]espondents[, Xinke and Haitian,] that [was] reasonable in light of the Department's duty

to determine rates as accurately as possible."  *Yantai I*, 36 CIT at __, Slip Op. 12-95, at 30.  The

court's order was directed at valuing the factors of production, not reconsideration of the factors

of production themselves.  In its papers before this court challenging the Final Determination,

plaintiff did not make a claim that the surrogate values for steel should be derived from narrow-

gauge subheadings.  Had plaintiff done so, the court would have made a holding concerning this

issue in *Yantai I.*  As counsel for Xinke expressly stated at oral argument prior to the issuance of

*Yantai I*, however, it did not challenge the factors of production used to calculate the Petition

margins.  *Yantai I* Oral Arg. Tr. 49:7–12, Mar. 14, 2012 (ECF Dkt. No. 77) ("[Xinke's counsel

(addressing the court):] We didn't challenge the factors of production in the [P]etition.  We

simply challenged the valuations of those factors and that's something that's a simple

mathematical exercise, so there are rates that can be looked at and used to calculate a rate for

Xinke and that's the [P]etition rates with the proper surrogate value supply.").

       Relatedly, plaintiff did not challenge the methodology used to calculate the Petition

margins.  As Commerce points out, changing the input used to value Jiulong's factors of

production from wide-gauge to narrow-gauge steel would require other changes in the factors of

production because the production processes would change.  Thus, using narrow-gauge HTS

subheadings to value Jiulong's hot-rolled steel coil rather than the wide-gauge HTS subheadings

used in the Petition would require Commerce to choose different factors of production (e.g., raw

materials, electricity, labor, and yield losses) that corresponded to the production process for

narrow-gauge steel coil.  Because plaintiff declined to raise this issue before the court prior to

remand, Commerce is correct that reviewing the factors of production themselves is beyond the

scope of the court's order.  Thus, the Department complied with the court's order that instructed

the use of updated surrogate values, not different factors of production.

### B. Commerce's Choice of Financial Statements Used for the Calculation of Financial Ratios Was Reasonable

#### 1.    *Greatweld*

When calculating the dumping margins included in its Petition, defendant-intervenors used the 2006–2007 financial statements of an Indian producer of welded line pipes, Jindal, and of an Indian producer of welded pipe, Bihar, to value "factory overhead, selling[,] general and administrative expenses, and profit percentages."  Mem. from Rebecca Pandolph, International Trade Compliance Analyst, Import Administration, to the File at 152, A-570-947 (Oct. 30, 2008) (P.R. Doc. 1).  In the preliminary and final determinations, the Department chose not to employ these financial statements.  Rather, Commerce used financial ratios derived from the 2007–2008 financial statements of, what the Department determined to be, two Indian producers of comparable merchandise, Mekins and Rama.  Preliminary Determination, 75 Fed. Reg. at 854–55.  Mekins's financial statement was supplied by defendant-intervenors in a supplement to their Petition, and the Rama financial statement was submitted to the Department by Jiulong during Commerce's investigation.  Preliminary Determination, 75 Fed. Reg. at 854.  Using these financials, Commerce recalculated "a weighted-average margin based on the number of pieces of steel grating from the Petition," to reach the 136.76 percent rate assigned to Xinke and Haitian in the Final Determination.  Calculation Mem. at 2.

The court, in its remand order, instructed Commerce in *Yantai I* "to determine whether a more accurate antidumping margin could be assigned based on the surrogate data submitted during the investigation."  *Yantai I*, 36 CIT at __, Slip Op. 12-95, at 12.  On remand, Commerce updated the financial ratios to recalculate the Petition margins.  In updating the ratios, the Department reevaluated "each set of financial statements submitted to the record by interested parties as the basis for calculating these surrogate financial ratios."  Remand Results at 6 & n.14.

In its draft results of redetermination, Commerce initially used the 2008–2009 Greatweld

Steel Grating Private Ltd. ("Greatweld") financial statements, offered by defendant-intervenors,

"to calculate and update the financial ratios, based on record evidence that Greatweld [was] the

only company whose financial statements [were] on the record which produce[d] *identical*

merchandise (i.e., steel grating)."  Remand Results at 6 n.15 (emphasis added); Draft Results of

Redetermination Pursuant to Ct. Remand 6, PD 1 at bar code 3102556-01 (July 18, 2012), ECF

Dkt. No. 107-1 (July 31, 2013) ("Draft Remand Results").  Upon further review of the record,

however, the Department decided not to use the 2008–2009 Greatweld financial statements after

finding that they were not publicly available, and thus, "not usable for the Department's

calculations."  *See* Remand Results at 6 n.15.

Greatweld is an Indian manufacturer of steel grating.  *See* Remand Results at 6 n.15.

Defendant-intervenors contend that Commerce erred in finding that components of Greatweld's

financial statements, particularly the profit-and-loss statement, were not publicly available.  Def.-

Ints.' Cmts. on Final Results of Redetermination Pursuant to Ct. Remand 12 (ECF Dkt. No. 88)

("Def.-Ints.' Cmts.").  Defendant-intervenors assert that they were able to obtain at least portions

of the financials from three independent sources: (1) India's Ministry of Corporate Affairs'

Registrar of Companies ("MCARC"), to which they paid a fee, (2) a market research firm

("Brisk") they hired, and (3) from the website of a debt rating agency ("ICRA Limited").  Def.-

Ints.' Cmts. 13.  They further claim that they obtained the entire profit-and-loss statement from

Brisk.  *See* Mem. from Brandon Farlander, International Trade Compliance Analyst, to the File,

PD 22 at bar code 3112144-01 (Dec. 26, 2012), ECF Dkt. No. 107-22 (July 31, 2013) ("Profit-

and-loss Statement Mem."); Letter from Timothy C. Brightbill, Wiley Rein LLP, to the Hon.

Rebecca M. Blank, Acting Secretary of Commerce, Dep't of Commerce at 10, PD 21 at bar code

3107582-01 (Nov. 27, 2012), ECF Dkt. No. 107-21 (July 31, 2013) ("Resp. to Clarification

Supplemental Questionnaire").  Therefore, defendant-intervenors maintain that the Greatweld

financials were "widely available to any number of individuals, market research companies, and

ratings bodies" and are therefore publicly available.  Def.-Ints.' Cmts. 14.  Accordingly,

defendant-intervenors argue that Greatweld's financial statements were the best information

available on the record from which to calculate and update the financial ratios, and that

Commerce erred by abandoning use of the Greatweld financials in the Remand Results.

        Defendant-intervenors also contend that the Department's finding that Greatweld's

financial statements were not publicly available is inconsistent with Commerce's prior practice.

*See* Def.-Ints.' Cmts. 14 & n.4.  That is, they insist that Commerce has previously found other

financial statements that were available by similar means to be publicly available.  *See* Def.-

Ints.' Cmts. 13 & n.4.

        In order to test whether Greatweld's 2008–2009 financial statements were publicly

available, Commerce asked defendant-intervenors to provide a step-by-step history of how they

located the company's financial information "of sufficient detail so that any party would be able

to replicate these steps to acquire Greatweld's . . . financial statements."  Remand Results at 20.

In response, defendant-intervenors explained that they obtained Greatweld's annual report and

balance sheet from the MCARC's website and, using that information, "asked [Brisk] to obtain

Greatweld's entire financial statement.  [Brisk] did this, using its *relevant sources* in India."

Resp. to Clarification Supplemental Questionnaire at 4 (emphasis added).  Additionally,

defendant-intervenors provided summaries of "Greatweld's profit [and loss], turnover[,] and

other key data" that it obtained from the ICRA Limited debt rating agency's website.  Resp. to

Clarification Supplemental Questionnaire at 5.  Commerce states, however, that defendant-

intervenors "did not provide a detailed explanation of how [Brisk] acquired Greatweld's complete financial statements" and determined that defendant-intervenors' explanation was insufficient "[b]ecause the other interested parties to the proceeding, as well as the Department itself, d[id] not know the steps necessary to acquire [portions of the financial statements, including the profit-and-loss statement], and, therefore, could not acquire that data themselves . . . ." Remand Results at 20, 22.

Thus, for Commerce, while Greatweld's financial statements might be obtainable through the payment to an unnamed "foreign market research company" that then obtained the financials from unidentified "relevant sources," defendant-intervenors' explanation did not provide a sufficient road map for others to follow, in order to obtain the documents. Further, Commerce found that "while [defendant-intervenors] submitted financial data from ICRA Limited . . . and Brisk, these data are not complete financial statements and [were] thus not usable to calculate financial ratios." Remand Results at 23. Put another way, for Commerce, the publicly available information was incomplete, and the remaining information was not publicly available. As a result, according to Commerce, the financials could not be said to be publicly available.

In non-market economy antidumping cases, such as this, in selecting financial statements to calculate the financial ratios used to determine an exporter's dumping margin, "Commerce looks to specificity, contemporaneity, and quality of the data." *Dongguan Sunrise Furniture Co. v. United States*, 37 CIT __, __, 904 F. Supp. 2d 1359, 1366 (2013) (citation omitted) (internal quotation marks omitted). Further, the Department's "selection of financial statements to calculate the financial ratios . . . is guided by a general regulatory preference for publicly available, non-proprietary information." *Since Hardware (Guangzhou) Co. v. United States*, 37 CIT __, __, 911 F. Supp. 2d 1362, 1366 (2013) (citing 19 C.F.R. §§ 351.408(c)(1), (4) (2012)

("For manufacturing overhead, general expenses, and profit, the [Department] normally will use non-proprietary information gathered from producers of identical or comparable merchandise in the surrogate country.")).  Commerce's regulatory preference for publicly available information stems from its "concern that a lack of transparency about the source of the data could lead to proposed data sources that lack integrity or reliability."  *Id.* at __, 911 F. Supp. 2d at 1367 (citation omitted) (internal quotation marks omitted).

This Court has repeatedly confirmed the importance of public availability of the financial statements used for surrogate values.  *See, e.g.*, *Jining Yongjia Trade Co. v. United States*, 34 CIT __, __, Slip Op. 10-134, at 23 (2010) ("Commerce's practice, in selecting the best available information for valuing [factors of production], is to select surrogate values which are product-specific, representative of a broad market average, *publicly available*, contemporaneous with the [period of review] and exclusive of taxes and duties." (emphasis added) (citation omitted) (internal quotation marks omitted)); *Home Prods. Int'l, Inc. v. United States*, 32 CIT 337, 342, 556 F. Supp. 2d 1338, 1343 (2008) ("If there is no quantitative or qualitative difference between the two statements, and one is completely publicly available and the other is not (missing a profit and loss statement), then Commerce's choice of a complete, publicly available financial statement consistent with its regulatory preference is, in the court's view, not only reasonable, but correct.").

The importance of having a profit-and-loss statement included in surrogate financial statements has been consistently expressed by Commerce because its practice is to not use surrogate data from companies that record a loss or zero profit during the POI.  *See, e.g.*, Steel Concrete Reinforcing Bars From the PRC, 66 Fed. Reg. 33,522 (Dep't of Commerce June 22, 2001) (notice of final determination of sales at less than fair value), and accompanying Issues &

Dec. Mem. at cmt. 8; Certain Fresh Cut Flowers From Ecuador, 64 Fed. Reg. 18,878, 18,883

(Dep't of Commerce Apr. 16, 1999) (prelim. results and partial rescission of antidumping duty

admin. review); Silicomanganese From Brazil, 62 Fed. Reg. 37,869, 37,877 (Dep't of Commerce

July 15, 1997) (final results of antidumping duty admin. review).  This is because the Statement

of Administrative Action, which accompanies the Uruguay Round Agreements Act, requires that

an element of profit be included in the calculation of constructed value.  H.R. DOC. NO. 103-316

at 839–40 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4175–76.  "Because constructed value

serves as a proxy for a sale price, and because a fair sales price would recover [selling, general,

and administrative] expenses and would include an element of profit, constructed value must

include an amount for [selling, general, and administrative expenses] and for profit."  H.R. DOC.

NO. 103-316 at 839 (1994), *reprinted in* 1994 U.S.C.C.A.N. at 4175.  Indeed, this Court has

found that, under certain circumstances, it would be unreasonable for Commerce to rely on

financial statements that lack a profit-and-loss statement.  *See, e.g.*, *Home Prods. Int'l*, 32 CIT at

342; *cf. Dongguan*, 37 CIT at __, 904 F. Supp. 2d at 1366 (finding a company's financial

statement to be incomplete and unreliable, and thus, unusable, because the statement was missing

a tax line item).

        The court finds that the profit-and-loss statement placed on the record by defendant-

intervenors does not rise to the level of "publicly available."  Commerce, in preparing the

Remand Results, was presented with the question of determining whether to use the financial

statements of a company that produced identical merchandise to steel grating, but whose

financials were not publicly available, or the financial statements of eight companies that

produced comparable merchandise to steel grating, but whose financials were readily available to

the public.  Commerce reasonably chose the latter.

The Department, on several occasions, asked defendant-intervenors to submit a step-by-step explanation, outlining how they obtained Greatweld's 2008–2009 profit-and-loss statement. Remand Results at 22.  Defendant-intervenors' responses were inadequate because they failed to provide a sufficiently detailed explanation of how the unnamed foreign market research company acquired Greatweld's complete financial statements from its unidentified "relevant sources." Thus, defendant-intervenors failed to make the requisite demonstration that the Department or the other interested parties could access the same financial data.  Remand Results at 22. Consequently, no publicly available profit-and-loss statement was placed on the record for Greatweld, and, as a result, as the Department notes, Commerce could not ascertain whether Greatweld recorded a profit or a loss during the POI.  *See* Remand Results at 23.  Because it is Commerce's reasonable practice to use financial statements of companies that record a profit to calculate surrogate financial ratios, Greatweld's publicly available partial financial statements are materially incomplete.  The court reaches this conclusion after having taken into account defendant-intervenors' arguments.

As part of their argument, defendant-intervenors assert that, here, Commerce has departed from its prior practice by finding Greatweld's financial statements were not publicly available.  The court is not persuaded.  Defendant-intervenors cite Certain Lined Paper Products From the PRC, 71 Fed. Reg. 53,079 (Dep't of Commerce Sept. 8, 2006) (notice of final determination of sales at less than fair value, and affirmative critical circumstances, in part), and accompanying Issues & Dec. Mem. at cmt. 1, where Commerce concluded that "financial statements of private companies filed with Indian Registrar of Companies are in the public realm."  They also cite Certain Activated Carbon from the PRC, 74 Fed. Reg. 57,995 (Nov. 10, 2009) (final results of admin. review), and accompanying Issues & Dec. Mem. at cmt. 2, in

which Commerce accepted financial statements from the Indian Ministry of Corporate Affairs'

website as publicly available.  Remand Results at 21 & n.47; Def.-Ints.' Cmts. 13 & n.4.  The

court notes, however, that these decisions appear to support only the conclusion that Commerce

consistently considers documents, such as those from MCARC (India's Ministry of Corporate

Affairs' Registrar of Companies), to be publicly available.  In this case, Commerce has not

disputed the public availability of the MCARC documents, but rather the public availability of

the profit-and-loss statement that defendant-intervenors acknowledge was not retrieved from

MCARC.  *See* Remand Results at 22; Profit-and-loss Statement Mem.

Defendant-intervenors next cite 1-Hydroxyethylidene-1, 1-Diphosphonic Acid from the

PRC, 74 Fed. Reg. 10,545 (Dep't of Commerce Mar. 11, 2009) (final determination of sales at

less than fair value), and accompanying Issues & Dec. Mem. at cmt. 1, in which Commerce

notes that it "frequently accept[s] sources of information obtained through fee-based internet

services."  Here, however, the only fee-based internet service that defendant-intervenors state

that they used was MCARC, and Commerce has accepted documents from that source as

publicly available.  Brisk, on the other hand, is a research company located in India.  Remand

Results at 20.  It is the public availability of the profit-and-loss statement provided by Brisk that

Commerce questions, not information supplied by a fee-based internet service.  Thus, this agency

determination does not help defendant-intervenors.

Defendant-intervenors also cite Floor-Standing, Metal-Top Ironing Tables and Certain

Parts Thereof From the PRC, 76 Fed. Reg. 15,297 (Dep't of Commerce Mar. 21, 2011) (final

results of antidumping duty admin. review), in which Commerce found that it could use financial

statements obtained from a public source.  Def.-Ints.' Cmts. 13 n.4.  Citation of this review does

not aid defendant-intervenors, however, because it is precisely that the profit-and-loss statement

has *not* been obtained from a public source that caused Commerce to decline to use the

Greatweld profit-and-loss statement obtained by Brisk.

Finally, defendant-intervenors cite Persulfates From the PRC, 67 Fed. Reg. 50,866,

50,869 (Dep't of Commerce Aug. 6, 2002) (prelim. results of antidumping duty admin. review

and notice of partial recission) ("*Persulfates*"), in which Commerce found that the financial

statements of a private firm under review could be considered publicly available if, among other

conditions, the statements were placed on the record by that firm.  *Persulfates*, however, is

distinguishable from the case at-hand because Greatweld has not placed its financial statements

on the record.  Rather, it is defendant-intervenors that have placed the Greatweld financial

statements on the record.  Further, unlike the companies in *Persulfates*, Greatweld is neither a

respondent under review, nor a party to this action.  In sum, the court finds that the record does

not reflect that Commerce has unreasonably deviated from its prior practices in determining

public availability.

Next, the court cannot credit defendant-intervenors' assessment that, because they were

able to obtain Greatweld's financial data, these statements were necessarily widely available to

the public.  As defendant-intervenors note, Commerce "'must address significant arguments and

evidence which seriously undermines its reasoning and conclusions.'"  Def.-Ints.' Cmts. 14

(quoting *Altx, Inc. v. United States*, 25 CIT 1100, 1117–18, 167 F. Supp. 2d 1353, 1374 (2001)).

Defendant-intervenors, however, have failed to present any significant argument.  Commerce's

concern is that other interested parties may not be able to independently access the information,

and this is the bar that Commerce has reasonably set for public availability.  That Brisk, which

specializes in mining financial data, was able to obtain the profit-and-loss statement, provides

little indication that other interested parties lacking the data mining skills and expertise of Brisk,

could independently do the same.  *See* Profit-and-loss Statement Mem. ("[Defendant-intervenors] stated that the market research company [(Brisk)] acquired Greatweld's profit and loss statement.").

Nor can defendant-intervenors rely on *Ass'n of American School Paper Suppliers v. United States* as an instance where this Court has upheld Commerce's use of incomplete financial statements.  *See Ass'n of Am. Sch. Paper Suppliers v. United States*, 35 CIT __, __, 791 F. Supp. 2d 1292, 1303–05 (2011).  Defendant-intervenors' assert that *School Paper Suppliers* stands for the proposition that Commerce has used incomplete financial statements in the past to calculate financial ratios.  In *School Paper Suppliers*, however, Commerce chose to use incomplete financial statements only after finding that they were not missing "key sections that [were] vital" to its analysis and calculations.  *Id.* at __, 791 F. Supp. 2d at 1304 (internal quotation marks omitted).  In particular, although the financial statements in *School Paper Suppliers* were incomplete, they contained a publicly available profit-and-loss statement.  *See id.* at __, 791 F. Supp. 2d at 1299 ("[Commerce] found that the . . . data contained a director's report, auditor's reports, balance sheet, *profit and loss statement*, notes, and accounting policies." (emphasis added) (citation omitted)).  As discussed above, Commerce has been reasonable in consistently emphasizing the importance it places on profit-and-loss statements.  Moreover, this Court has upheld this practice, and continues to do so here.  *See, e.g.*, *Home Prods. Int'l*, 32 CIT at 342, 556 F. Supp. 2d at 1343.

Accordingly, the court finds that Greatweld's 2008–2009 financial statements were incomplete because they lacked a profit-and-loss statement that was publicly available.  Thus, Commerce reasonably determined, on remand, that Greatweld's financials could not be used to calculate the surrogate financial ratios.

2.      *Mekins*

By means of a supplement to the Petition underlying this investigation, defendant-intervenors placed on the record the 2007–2008 financial statements of Mekins, an Indian company, which they asserted manufactured wire decking, merchandise comparable to steel grating from the PRC.  *See* Preliminary Determination, 75 Fed. Reg. at 854.  Although the Department initially used the 2007–2008 Mekins financial statements in the preliminary and final determinations to calculate surrogate financial ratios, Commerce declined to use Mekins's financials on remand, "find[ing] that the record d[id] not support finding that any of Mekins'[s] products [manufactured during the fiscal year were] comparable to steel grating" (i.e., wire decking).  Remand Results 31.  Thus, Commerce found that, Mekins neither manufactured an identical product to steel grating, nor did it produce a comparable product.

Defendant-intervenors insist that Commerce should have used Mekins's financials in its surrogate value analysis, stating that, in fact, Mekins produces wire decking, a comparable product to steel grating.  *See* Def.-Ints.' Cmts. 17.  In support of their position, defendant-intervenors point to a printout of Mekins's webpage that lists wire decking as one product that it produces, and they contend that Commerce has not addressed this evidence in the Remand Results.  Def.-Ints.' Cmts. 17–18.

The court fails to find merit in any of these assertions.  As Commerce points out, the printout of Mekins's webpage, while some evidence that Mekins could produce wire decking, is insufficient evidence that Mekins was a producer of wire decking *during the POI.  See* Remand Results at 31; Def.'s Resp. 22–23.  That is, although the webpage indicates Mekins's ability to produce wire decking, it does not demonstrate that Mekins produced wire decking between the period of October 1, 2008 and March 31, 2009 (during the POI).  Thus, the webpage does not

provide any evidence of the importance of wire decking production to Mekins's financials, i.e.,

how much wire decking Mekins produced annually, how much it produced relative to its other

products, whether it produced wire decking regularly, or whether it produced wire decking

during the POI.

Moreover, Commerce examined Mekins's financial statements from 2007–2008 (the year

prior to the POI) that defendant-intervenor placed on the record, and found that they provide no

evidence that the company produced any wire decking that year.  That is, the financials list

quantities produced of specific products, and wire decking is notably absent.  *See* Remand

Results at 31.  Further, Commerce examined Mekins's financial statements from 2008–2009 (the

year of the POI) which plaintiff initially placed on the record during the investigation, and found

that there was nothing that speaks directly to Mekins's production of wire decking during the

POI.  *See* Remand Results at 31.  Accordingly, because defendant-intervenors can only point to

evidence that Mekins had the ability to produce a comparable product to steel grating, and the

Department lacked record evidence that the company actually manufactured this product during

the POI, Commerce reasonably concluded "that there [was] insufficient evidence on the record to

indicate that Mekins actually manufactured wire decking during the [POI]," and the Department

was thus reasonable in its decision not to use the company's financials to calculate surrogate

financial ratios.  Remand Results at 31.


### 3.    *Comparability of Steel Pipe and Tube Producers*

As noted, in the Remand Results, Commerce determined that there were no usable

financial statements on the record of manufacturers of identical merchandise to steel grating.

Thus, the Department used the 2008–2009 financial statements, which were specific to the POI,

of Rama, Vallabh, NIL, NTL, North Eastern, Good Luck, Zenith Birla, and Shri Lakshmi, eight

manufacturers of steel pipe and tube (merchandise Commerce determined to be comparable to

steel grating), as the basis for calculating the surrogate financial ratios.  Remand Results at 6.

Defendant-intervenors object to the use of financial statements from steel pipe producers,

arguing that (1) steel pipes are not comparable merchandise to steel grating, (2) they placed

evidence on the record to that effect, that Commerce failed to adequately address, and (3)

because Commerce failed to articulate a satisfactory explanation for its action and address

evidence that undermines its conclusion," the Department's decision is not based on substantial

evidence.  Def.-Ints.' Cmts. 19, 20 (citations omitted) (internal quotation marks omitted).

As an initial matter, and as has been previously discussed, because the Department

reasonably found that Greatweld's financials were not publicly available, there are consequently

no usable financial statements on the record for manufacturers of steel grating, i.e., the identical

product.  Additionally, as noted, Commerce reasonably determined that there was insufficient

evidence that Mekins produced comparable merchandise to steel grating (i.e., wire decking)

during the POI.  Thus, Commerce looked to the record for financials of other producers of

comparable merchandise.  *See, e.g.*, *Viraj Forgings, Ltd. v. United States*, 27 CIT 1472, 1485,

283 F. Supp. 2d 1335, 1347 (2003) ("While it is certainly simpler for Commerce to identify and

compare identical merchandise when it exists; lacking identical goods for comparison[,]

Commerce must find similar merchandise in order to make a proper comparison with the United

States imports" (citing *NTN Bearing Corp. of Am. v. United States*, 127 F.3d 1061, 1063 (Fed.

Cir. 1997))).

With respect to comparability, defendant-intervenors make the following arguments: that

(1) "[s]teel pipe production requires substantially more machinery, technical skill, expense, and

sophistication than the production of steel grating;" (2) Commerce "failed to address [defendant-intervenors'] contention that the end-uses of steel grating and steel tube and pipe differ;" (3) "[p]ipe and tube products clearly have no such similar use . . . to steel grating;" and (4) pipe producer Vallabh, whose financial statements were used as a source of the surrogate financial ratios, "devotes a significant portion of its operations—well over 50 percent—to the production of cold-rolled steel" and sponge iron, and is "therefore far removed from the business" of steel grating manufacturing."  Def.-Ints.' Cmts. 19–22.

"Comparability" is not defined in the governing statute or regulation.  *See* 19 U.S.C. § 1677b(c); 19 C.F.R § 351.408(c)(4).  To determine comparability, Commerce's regular practice is to consider the products' physical characteristics, end uses, and production processes.  *See Jiaxing Brother Fastener Co. v. United States*, 34 CIT __, __, 751 F. Supp. 2d 1345, 1355 (2010); *see also Lifestyle Enter., Inc. v. United States*, 35 CIT __, __, 768 F. Supp. 2d 1286, 1307 (2011) ("In creating surrogate values, Commerce uses data from producers of 'comparable merchandise,' considering end uses, physical characteristics, and production processes." (citation omitted)).

Contrary to defendant-intervenors' contentions, the court finds that Commerce has adequately demonstrated that steel grating and steel piping and tubing are comparable products. As an initial matter, Commerce noted on remand that it found the steel pipe and tube industry to be comparable to the steel grating industry in the Preliminary Determination.  Remand Results at 24 (citing Preliminary Determination, 75 Fed. Reg. at 855).  In the Remand Results, Commerce based its findings largely on the similarities of the production processes.  *See* Remand Results at 24–25.  The Department noted that steel pipe and tube, and steel grating use hot-rolled steel coil as the main input and that both have a similar method of production that involves cutting hot-

rolled steel coil into strips, shaping the strips, and welding the strips.  *See* Remand Results at 24–

25 (citation omitted).  Although welding shaped strips into pipe differs from welding the strips

together to form grating, the similarities in the processes are obvious.  Thus, the main input for

steel grating and steel tubing are identical and the production processes are similar.  Further,

although defendant-intervenors allege that the production process for steel pipe is considerably

more challenging and costly than that of steel grating, because welding strips together is the

primary process used to make both products, Commerce reasonably determined that the

production processes for the two products were nonetheless sufficiently similar to render the

steel pipe and tube industry comparable.

Though Commerce's practice is to consider a product's end use, physical characteristics,

and production process in determining comparability, it is not restricted to using products that

are comparable along all three fronts, and the conclusion that two products may be comparable

for the purposes of surrogate valuation, and yet have different end uses, is not novel.  *See, e.g.*,

*Musgrave Pencil Co. v. United States*, 31 CIT 445, 450 (2007); *Shanghai Foreign Trade Enters.*

*v. United States*, 28 CIT 480 (2004) (listing past cases in which Commerce "has found

comparability despite differences in shape, size and end use," because the "two classes of

products [were] made using similar materials and production processes"); Wire Decking from

the PRC, 75 Fed. Reg. 32,905 (Dep't of Commerce June 10, 2010) (final determination of sales

at less than fair value), and accompanying Issues & Dec. Mem. at cmt. 2 ("Although the end use

of tyre bead, steel wire rope, other wire products, hinges, nails and blades may differ from wire

decking the raw material inputs, production process, and machinery required are sufficiently

similar to that of wire decking."); Glycine from the PRC, 66 Fed. Reg. 8,383 (Dep't of

Commerce Jan. 31, 2001) (final results of new shipper administrative review), and

accompanying Issues & Dec. Mem. at cmt. 7 ("[G]lycine and phenylglycine have similarities

with regard to material inputs and production processes.  For example, both processes appear to

use similar equipment . . . in manufacturing the glycine and phenylglycine[, and] . . . the steps

involved in the production processes [of both products] appear to be similar."); *cf.* H.R. REP. NO.

100-576, at 591 (1988) (Conf. Rep.), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1624 ("Commerce

should seek to use, if possible, data based *on production of* the same general class or kind of

merchandise using similar levels of technology and at similar levels of volume as the producers

subject to investigation." (emphasis added)).

        That Commerce has not specifically addressed defendant-intervenors' contentions that

steel grating and steel piping have different end uses, does not warrant a remand.  While

Commerce takes into account a product's end use, physical characteristics, and production

processes in its comparability analysis, the objective here is to determine surrogate financial

ratios based on the cost of production.  Production processes and the physical characteristics of

the compared products are therefore the more important factors.  Here, because the major input is

identical, and cutting and welding steel strips are the most important manufacturing processes,

the manner of manufacture is similar, and thus, Commerce has not erred in finding

comparability.  *See* H.R. REP. NO. 100-576, at 591, *reprinted in* 1988 U.S.C.C.A.N. at 1624.

        Finally, defendant-intervenors' contention that Commerce failed to address evidence that

Vallabh produces cold-rolled steel and sponge iron, in addition to piping and tubing, and is

"therefore far removed from the business of" manufacturing steel grating, is at odds with the

record.  Def.-Ints.' Cmts. 22.  In the Remand Results, Commerce points directly to evidence on

the record, namely Vallabh's financial statements, demonstrating that Vallabh "is primarily a

manufacturer and seller of steel pipe and tube" insofar as it produced significantly more steel

piping than any other product during the POI with more than twice as much of its revenue

coming from the sale of steel piping as from cold-rolled steel, its next most important product.

*See* Remand Results at 25–26, 26 n.68 (citing Vallabh Steels Limited Annual Report 2008–2009

at 307, A-570-947 (Mar. 1, 2010) (P.R. Doc. 167) ("Vallabh Annual Report")).  As Commerce

correctly notes, "[t]hat Vallabh *also* produces cold-rolled steel [and sponge iron] does not

undermine the fact that Vallabh is a producer of [steel pipe and tubing,] which is a comparable

merchandise" to steel grating.  Def.'s Resp. 15.  In other words, Vallabh's financial statements

indicate that a major source of the company's business is the manufacturing and sale of steel pipe

and tubing.  Vallabh's financials are thus largely reflective of the production of steel pipe and

tubing, comparable merchandise to steel grating.  In addition, because Vallahb's financial

statements are used in combination with seven other companies, whose primary production is of

comparable merchandise, it cannot be said that the use of Vallabh's financials was unreasonable.

Accordingly, Commerce's determination to use the financial statements of the steel

piping and tubing producers is supported by substantial evidence.


### 4.      *Receipt of Subsidies by Producers of Comparable Merchandise*

As noted, on remand, Commerce used the financial statements of Indian companies,

Rama, Vallabh, NIL, NTL, North Eastern, Good Luck, Zenith Birla, and Shri Lakshmi, to

calculate the surrogate financial ratios, finding that these companies' financial statements were

for comparable merchandise and "more contemporaneous than the financial statements used in

the [P]etition and the Preliminary Determination."  *See* Remand Results 6.

a.   NTL, NIL, North Eastern, and Good Luck

Defendant-intervenors challenge Commerce's use of the NTL, NIL, North Eastern, and

Good Luck financial statements, claiming that there is evidence that these companies received

countervailable subsidies during the POI.  Def.-Ints.' Cmts. 23–24.  Defendant-intervenors

suggest that "the significant amount of subsidies referenced in the companies' financial

statements strongly indicate that these statements are distorted and unreliable."  Def.-Ints.' Cmts.

24.  In particular, defendant-intervenors note that NTL received a subsidy listed as "Duty

Entitlement on Exports," which they claim is similar to the "Duty Entitlement Pass Book

Scheme" that Commerce has previously found to be countervailable.  Def.-Ints.' Cmts. 23–24.

Defendant-intervenors contend that, "given the nearly identical name of these two programs, the

Department erred in failing to provide evidence to support its conclusion that [the two] are

distinct subsidy programs."  Def.-Ints.' Cmts. 24.

Commerce's general practice is not to use financial statements to calculate financial

ratios from companies that are known to receive countervailable subsidies.  This practice results,

in part, from Congress's direction in the legislative history to the Omnibus Trade and

Competitiveness Act of 1988, that "Commerce shall avoid using any prices which it has reason

to believe or suspect may be dumped or subsidized prices . . . base[d] on information generally

available to it at that time."  H.R. REP. NO. 100-576, at 590–91, *reprinted in* 1988 U.S.C.C.A.N.

at 1623–24.  The Department has further observed that its practice of declining to use the

financials of companies known to have received countervailable subsidies is based on the idea

that these financial statements may be less representative of the financial experience of the

relevant industry than financial statements that do not contain evidence of these types of

subsidies.  Remand Results at 26; *see also Jiaxing*, 34 CIT at __, 751 F. Supp. 2d at 1353.

Nevertheless, Commerce's policy is not to reject financials containing evidence of

subsidies of an unknown character unless there is evidence that the subsidies were distortive with

respect to the subject merchandise during the POI.  *See, e.g.*, Persulfates from the PRC, 68 Fed.

Reg. 68,030 (Dep't of Commerce Dec. 5, 2003) (final results of antidumping duty administrative

review), and accompanying Issues & Dec. Mem. at cmt. 3 (collectively, "Persulfates Final

Results").  The Department's stated reason for not disregarding all financials with evidence of a

subsidy is that, "[i]n the case of a potential surrogate in receipt of government subsidies, the

[mere] existence of a subsidy is not, in and of itself, sufficient evidence of such distortion."

Persulfates Final Results at cmt. 3.  Thus, except for countervailable subsidies, the Department

requires evidence of distortion before it will discard financial statements.

 Moreover, as stated in the Conference Report for the enacting statute, Congress did "not

intend for Commerce to conduct a formal investigation" [with respect to subsidization,] but

rather intend[ed] that Commerce base its decision on information generally available to it at th[e]

time."  H.R. REP. NO. 100-576, at 590–91, *reprinted in* 1988 U.S.C.C.A.N. at 1623–24.

The court finds that the Department's decision to use the financial statements of NTL,

NIL, North Eastern, and Good Luck to calculate financial ratios was reasonable.[7]  Here, although

---

[7]        It should be noted that the facts and circumstances of this case differ from those
found in *Fuyao Glass Indus. Group Co. v. United States*, 29 CIT 109 (2005).  In that case,
Commerce determined that surrogate prices from a country should be disregarded based on a
finding that there was a "reason to believe or suspect" that the surrogate prices were subsidized.
*See Fuyao Glass*, 29 CIT at 111–21 (quoting H.R. REP. NO. 100-576, at 590, *reprinted in* 1988
U.S.C.C.A.N. at 1623).  In *CS Wind Vietnam Co. v. United States*, the Court discussed the
standard set forth in *Fuyao Glass*.  *CS Wind Vietnam Co. v. United States*, 38 CIT __, __, Slip
Op. 14-33, at 32–33.  As noted by the Court in *CS Wind*, the *Fuyao Glass* standard requires the
Department, when considering such a determination, to justify its belief or suspicion with respect
to the prices of products of specific companies by showing that "'(1) subsidies of the industry in
question existed in the supplier countries during the [POI]; (2) the supplier in question is a
member of the subsidized industry or otherwise could have taken advantage of any available
                                                                    (footnote continued)

NIL, North Eastern, Good Luck, and NTL's financial statements indicate the receipt of subsidies

during the POI, there is no evidence on the record that any of the subsidies have been previously

investigated by the Department, and found to be countervailable.  More specifically, none of

NIL, North Eastern, or Good Luck's financials refer to a particular subsidy or export incentive

program.  Rather, their financial statements refer to the receipt of subsidies in general terms (e.g.,

"Export Incentives/Benefits Receivable," "State Capital Investment Subsidy," "Central Capital

Investment Subsidy," "Development Subsidy," etc.).  In addition, there is no record evidence of

the receipt of distortive subsidies.  Thus, although it is possible that the listed subsidies could be

found to be countervailable or to be otherwise distortive, there is no evidence that, in fact, they

were either.

Neither does the record contain evidence that the "Duty Entitlement on Exports" column

in NTL's financials refer to the "Duty Entitlement Pass Book Scheme," a program previously

investigated by the Department, and found to be countervailable.  Def.-Ints.' Cmts. 23–24.  Also,

nothing on the record points to the amounts NTL received as being distortive.

Finally, contrary to defendant-intervenors' assertion that Commerce should have

conducted a formal investigation to determine whether these programs were distinct from one

another, defendant-intervenors have been unable to point to, and the court is unaware of, any

statute, regulation, or agency practice that would require the Department to undertake such an

---

subsidies; and (3) it would have been unnatural for a supplier not to have taken advantage of such subsidies.'"  *Id.* (quoting *Fuyao Glass*, 29 CIT at 114).  Here, there is no claim that any financials should not be used because of the availability of countervailable subsidies for a particular industry in a particular country.  Rather, the claim is that there is evidence of the receipt of countervailable subsidies within the financials themselves, and that the financials are therefore unusable for purposes of calculating the financial ratios.  Because the claim involves financials that are on the record, the Department's inquiry need not reference the *Fuyao Glass* standard.  Rather, Commerce has reasonably looked to the financials themselves for evidence of unacceptable subsidies.

investigation.  Indeed, Congress's direction is that "Commerce base its [subsidy] decision on information generally available to it at that time."  H.R. REP. NO. 100-576, at 590–91, *reprinted in* 1988 U.S.C.C.A.N. at 1623–24.

Thus, because there is no evidence of specific countervailable subsidies, or any evidence of distortive subsidies in NIL, North Eastern, Good Luck, or NTL's financial statements, the Department did not err in including their financial statements in its calculations of the surrogate financial ratios.

### b.   Shri Lakshmi

Defendant-intervenors also object to the Department's reliance on the financial statements of Shri Lakshmi, an Indian company that Commerce found to be a producer of comparable merchandise to steel grating.  Defendant-intervenors claim that there is evidence that Shri Lakshmi benefitted from a countervailable subsidy received by its owner, Bihar, under the "Duty Entitlement Pass Book" scheme.  Def.-Ints.' Cmts. 24.  As noted, Commerce previously found that subsidy to be countervailable.    In particular, defendant-intervenors contend that they provided evidence to the Department that Shri Lakshmi purchased finished pipe from Bihar, thus benefitting from Bihar's subsidy stream, but that Commerce failed to address this evidence.  *See* Def.-Ints.' Cmts. 24.

As noted, Commerce will not reject a company's financial statements for use in calculating surrogate financial ratios, on the sole basis that the company's financials mention a subsidy, unless the Department has previously found that specific subsidy program to be countervailable or finds the subsidy distortive.  In addition, there must also be evidence that a benefit has actually been received as a result of the subsidy.  *See Delverde, SrL v. United States,*

202 F.3d 1360, 1364 (Fed. Cir. 2000) ("[T]he Tariff Act requires that Commerce make such a

determination by examining the particular facts and circumstances of the sale and determining

whether [the company] directly or indirectly received both a financial contribution and benefit

from a government."); *DuPont Teijin Films v. United States*, 37 CIT __, __, 896 F. Supp. 2d

1302, 1310 (2013).  Further, for a set of financials to be found unusable because of a

countervailable subsidy having been provided to a related company, there must be evidence that

a benefit received by one company actually benefited its related company.  *Delverde*, 202 F.3d at

1364.  For instance, in the context of the purchase of assets from a subsidized company, the

United States Court of Appeals for the Federal Circuit held that "the Tariff Act as amended does

not allow Commerce to presume conclusively that the subsidies granted to the [seller]

automatically 'pass[] through' to [the purchaser]." *Id.*

     Here, the court finds that defendant-intervenors' position lacks merit.  First, defendant-

intervenors' entire claim before Commerce was that, because Shri Lakshmi bought pipe from

Bihar, and Bihar received a countervailable subsidy, Shri Lakshmi "may benefit" from the

subsidy.  Rebuttal Br. of Alabama Metal Indus. Corp. and Fisher & Ludlow at 44–45, A-570-947

(Apr. 13, 2010) (P.R. Doc. 223).  Defendant-intervenors, however, have proffered no evidence

indicating that Shri Lakshmi received a benefit from any subsidy program identified by

Commerce to be countervailable, either through Bihar or otherwise.  The mere purchase of pipe

that might have been subsidized simply does not constitute substantial evidence.  That is, absent

some evidence, for instance, that the pipe was purchased at less than the market price, there is

nothing to indicate that Shri Lakshmi benefitted from the supposed countervailable subsidy

received by Bihar.

Accordingly, because Commerce may not presume a "pass through" of the subsidy, without more, the Department's determination to use Shri Lakshmi's financial statements to update the financial ratios as part of its calculation of the surrogate financial ratios cannot be said to be unreasonable.

Finally, because defendant-intervenors have failed to present any evidence that any of the companies whose financial statements were used received countervailable or distortive subsidies, Commerce reasonably determined to use these companies' financial statements in its calculations of surrogate financial ratios.

### C.  Commerce Correctly Accepted Plaintiff's Comments on the Draft Remand Results

Defendant-intervenors next argue that Commerce improperly accepted the untimely submission of plaintiff's comments on the Draft Remand Results.  Def.-Ints.' Cmts. 5.  The parties were initially given until October 29, 2012 to submit comments on the Draft Remand Results, and were all subsequently granted a two-day extension until October 31, 2012.  *See* Letter from Robert Bolling, Program Manager, Import Administration, to All Interested Parties, PD 14 at bar code 3103048-01 (Oct. 25, 2012), ECF Dkt. No. 107-14 (July 31, 2013).  On October 29 and 30, 2012, the federal government was closed due to Hurricane Sandy, and, as a result, on October 31, 2012, the Import Administration issued a general memorandum "tolling all Import Administration deadlines for two days."  *See* Mem. from Paul Piquado, Assistant Secretary for Import Administration, to the Record at 3, PD 17 at bar code 3103946-01 (Oct. 31, 2012), ECF Dkt. No. 107-17 (July 31, 2013) ("Tolling Mem.").  Two days after October 31, 2012 was November 2, 2012.  Defendant-intervenors submitted their comments to the Draft

Remand Results on Wednesday, October 31, 2012, while plaintiff submitted its comments on

Friday, November 2, 2012.

Defendant-intervenors argue that the two-day extension granted by the Import

Administration did not apply to this case because the "deadline for the Final Remand Results and

. . . all comments w[as] October 31, 2012," the day that the Tolling Memorandum was issued.

Def.-Ints.' Cmts. 5.  Thus, according to defendant-intervenors, plaintiff's submission on

November 2, 2012 was untimely.  Defendant-intervenors contend that, pursuant to 19 C.F.R. §

351.302(d)(1) (2012), Commerce should have rejected plaintiff's submission. *See* Letter from

Timothy C. Brightbill, Wiley Rein LLP, to the Hon. Rebecca M. Blank, Acting Secretary of

Commerce, Dep't of Commerce at 3, PD 18 at bar code 3104867-01 (Nov. 7, 2012), ECF Dkt.

No. 107-18 (July 31, 2013); 19 C.F.R. § 351.302(d)(1) ("Unless the Secretary [of Commerce]

extends a time limit [for good cause,] the Secretary will not consider or retain in the official

record of the proceeding . . . [u]ntimely filed factual information, written argument, or other

material that the Secretary rejects . . . .").

The court finds defendant-intervenors' position unconvincing because the submission of

plaintiff's comments on the Draft Remand Results was timely.  As a result of the government

closure on October 29 and 30, the Department was unable to issue a general notice of extension

until October 31, and indeed was unaware until October 31 of the number of days for which the

extension should be granted.  In addition, October 31 was the first day on which a notice

granting the extension could be published.  Thus, although the reason for granting the extension

occurred prior to October 31, that date was the first on which notice of extensions could be made

public.  Moreover, the text of the extension explicitly covers plaintiff. *See* Tolling Mem. at 3

("After careful consideration, the Import Administration has determined that the impact of the

recent Government closure during Hurricane Sandy will best be minimized by uniformly tolling

all Import Administration deadlines for two days.  The day on which any submission to the

Import Administration is due should be calculated under the regulations as usual, except with the

addition of two days (including weekends and holidays).  This determination applies to every

proceeding before the Import Administration, including . . . pending deadlines for actions by

parties to our proceedings (such as the submission of AD/CVD questionnaire responses,

supplemental questionnaire responses, and case and rebuttal briefs).").  Thus, plaintiff's

submission was timely.


## V.   DEFENDANT-INTERVENORS ASK THAT THE COURT RECONSIDER ITS PRIOR RULING

Defendant-intervenors ask the court to reconsider its prior rulings directing Commerce to

(1) reexamine the surrogate value data and calculate an antidumping margin for Xinke, and (2)

separately determine and corroborate a rate for Jiulong.  Def.-Ints.' Cmts. 11–12.  "[W]ithout

any margin on the record other than a margin based on total AFA, they argue that "the

Department appropriately resorted to the use of *any reasonable method* to calculate a separate

rate for Xinke and [Haitian]."  Def.-Ints.' Cmts. at 11–12.  Defendant-intervenors contend that

Commerce's selected rate, whereby it calculated "'the rate for the separate rate respondents,

including Xinke and . . . Haitian, using the simple average' of the five-price-to-[normal-value]

dumping margins contained in the [P]etition," was revised and corroborated, and accordingly a

reasonable methodology.  Def.-Ints.' Cmts. 12 (quoting Issues & Dec. Mem. at 33).

The court declines defendant-intervenors' invitation, and reaffirms its holding in *Yantai I*.

In *Yantai I*, the court found that Commerce had available to it relevant surrogate data on the

record that was likely to assist it in calculating a more accurate rate for Xinke and Haitian.  *See*

*Yantai I*, 36 CIT at __, Slip Op. 12-95, at 12.  While Commerce is empowered "to use any reasonable method" to calculate the margins, this does not relieve Commerce of its "duty to determine margins as accurately as possible, and to use the best information available to it in doing so."  *Lasko Metal Prods., Inc. v. United States*, 43 F.3d 1442, 1443 (Fed. Cir. 1994); *see* 19 U.S.C. § 1677f(3)(A) (2006) (requiring a final determination issued by Commerce to include "an explanation of the basis for its determination that addresses relevant arguments, made by interested parties who are parties to the investigation or review").  Moreover, the court found that Commerce acted unreasonably by disregarding Jiulong's separate-rate questionnaire responses in calculating Jiulong's AFA rate.  *Yantai I*, 36 CIT at __, Slip Op. 12-95, at 27–29.  Consistent with this Court's holdings, "imput[ing] the unreliability of a company's questionnaire responses and submissions concerning its factors of production and/or U.S. sales to its separate-rate responses when there is no evidence on the record indicating that the latter were false, incomplete, or otherwise deficient," is unreasonable.  *Yantai I*, 36 CIT at __, Slip Op. 12-95, at 27 (collecting cases).  Accordingly, based on the foregoing, this court continues to find its rulings in *Yantai I*, 36 CIT __, Slip Op. 12-95 to be correct, and will not disturb them now.


                                              **CONCLUSION**

        Based on the foregoing, it is hereby

        ORDERED that the Department of Commerce's Final Results of Redetermination are sustained.

Dated:          April 9, 2014
                New York, New York


                                              _____/s/ Richard K. Eaton_____
                                                        Richard K. Eaton